**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| **DUANE SHAW**<br>**14207 MacFarlane Green Court**<br>**Apartment 1140**<br>**Upper Marlboro, MD 20772**<br><br>          *Plaintiff,*<br><br>     v.<br><br>**UNIVERSITY OF MARYLAND,**<br>**COLLEGE PARK**<br>**4716 Pontiac Street,**<br>**Suite 2117 Seneca Building**<br>**College Park, MD 20742**<br><br>          *Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No. 8:21-cv-01986**<br><br>**Jury Trial Demand** |

**<u>COMPLAINT</u>**

Plaintiff Duane Shaw (hereinafter "Plaintiff Shaw," "Mr. Shaw," or "Plaintiff") by and through his attorneys, hereby files this Complaint against the University of Maryland, College Park (hereinafter "Defendant," "University of Maryland," or "UMD"). Plaintiff seeks relief pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; the Civil Rights Act of 1866, 42 U.S.C. § 1981; and breach of contract and seeks damages, including but not limited to declaratory, injunctive, and other equitable relief; compensatory and punitive damages; and litigation expenses and reasonable attorneys' fees based on Defendant's discriminatory, harassing, retaliatory, and otherwise unlawful actions against Plaintiff Shaw.

**<u>JURISDICTION AND VENUE</u>**

1.     This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1981.

2. Plaintiff has exhausted all administrative remedies prior to filing suit.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that all or some events or omissions giving rise to Plaintiff's claims occurred in this judicial district, and Defendant may be found in this judicial district.

## PARTIES

4. Plaintiff Shaw is an African American male and a resident of the state of Maryland. Plaintiff Shaw was an employee of Defendant University of Maryland.

5. Defendant University of Maryland is a public university in Maryland and an employer within the meaning of the statutes under which Plaintiff brings his claims.

## FACTS

6. Duane Shaw began working as a Research Systems Engineer at the University of Maryland, College Park ("UMD"), Division of Research, Center for Advanced Study of Language's ("CASL") Information Technology ("IT") section in October 2012. Mr. Shaw worked with IT infrastructure and was the technical subject matter expert for classified matters. The contracts with the federal government on which Mr. Shaw worked required him to have a security clearance.

7. In April 2013, there were layoffs in CASL which impacted a number of Caucasian employees, including employees in Plaintiff's department and section. Employees who were selected to be laid off received several months' advanced notice of their pending layoffs and were permitted to continue working until the day of their lay off. At the time the employees were given notice of the lay offer, they were informed of the lay off in their regular work location, and were not required to travel to another location at the University of Maryland and were not escorted by uniformed and armed security officers. After these employees received notice of their layoffs, they

2

were not immediately stripped of their building access or prohibited from returning to their offices to collect personal belongings.

8.     Mr. Shaw worked closely with Zanake Renibe, an African American male, and they both were supervised by John Romano, CASL Director of Technology, and a Caucasian male. During his tenure, Mr. Shaw was an exemplary employee and was involved in many research initiatives and co-developed an Intellectual Property folder that his Executive Director and Supervisor used to display and demonstrate the organization's capabilities. Mr. Shaw was also one of the technical advisers for the demonstrations to potential customer. Over the years, Mr. Romano began to resent Mr. Shaw because sponsors preferred to work with Mr. Shaw instead of Mr. Romano. The sponsors relied on Mr. Shaw more than Mr. Romano even though Mr. Shaw told the sponsors that they needed to go through Mr. Romano. Through 2018, Mr. Shaw received performance reviews which indicated that he met or exceeded performance objectives.

9.     From 2014 through 2018, Mr. Shaw was subjected to job bias and humiliation by Mr. Romano. Mr. Shaw also faced intimidation in the workplace which was condoned by Mr. Romano, such as when other IT engineers excluded him from planning and infrastructure, even though it is a job requirement for engineers to communicate with each other because the systems on which they work overlap. Mr. Shaw was one of only three African American males in the building; the workplace culture considered him a "worker bee," and his opinions and achievements were not respected. For instance, Mr. Shaw had helped created an intellectual property application for a contractor, and Mr. Shaw's ownership in the application was 25%. During the presentation, to which Mr. Shaw had been an equal creator, he was relegated to a low-level role and not presented as an equal partner.

10.     In April 2018, Mr. Romano completed Mr. Shaw's Performance Review Development ("PRD"). The PRD contained myriad inaccuracies, and Mr. Shaw discussed these inaccuracies with Mr. Romano during their PRD meeting. During the PRD meeting, Mr. Romano told Mr. Shaw that he, "do[es] not even know what [Mr. Shaw] do[es]." Mr. Romano said this despite the fact that he was Mr. Shaw's direct supervisor, assigned him tasks, and Mr. Shaw reported to Mr. Romano. Mr. Shaw asked Mr. Romano if the PRD would affect his promotion or access to assignments, and Mr. Romano answered that the PRD would not affect his promotion or access to assignments. Mr. Shaw asked Mr. Romano what he could do if he disagreed with the PRD, and Mr. Romano answered that Mr. Shaw could speak to University Human Resources ("UHR") Staff Relations. Mr. Shaw said that he would be willing to go to UHR Staff Relations but would prefer first working with CASL Human Resources ("HR"). Mr. Shaw then contacted Jacqueline Madoo, the CASL HR representative, and gave her his responses to the PRD. Mr. Shaw never received a reply to the response to the PRD he gave Ms. Madoo, despite Mr. Romano's assurance that Mr. Shaw's response could be discussed further. All of Mr. Shaw's previous PRDs stated that he had met expectations.

11.     In July 2018, Mr. Romano promoted an engineer non-competitively over Mr. Shaw even though Mr. Romano had previously told Mr. Shaw that the PRD would not affect his promotion, and Mr. Shaw and the promoted engineer had equivalent job duties.

12.     In October 2018, Mr. Shaw had a conversation with Mr. Romano about his concerns regarding Mr. Romano's regular meetings with other engineers in the unit and isolating Mr. Shaw as well as the dearth of communication even though the engineers were supposed to communicate about assigned work. Mr. Romano told Mr. Shaw that the other engineers were

working on a project that did not include him. Mr. Shaw told Mr. Romano that all of the jobs interact, so this project would affect him.

13.     Earlier in 2018, Mr. Shaw tested the email accounts of his fellow engineers. This duty is part of his job responsibilities in order to ensure that there is not malicious software. During his testing, Mr. Shaw saw an October 2017 email from one engineer to the team that documented Mr. Shaw's work. This email demonstrated that this engineer was closely monitoring Mr. Shaw and trying to portray him in a negative light. Previously, there had been tension between Mr. Shaw and this engineer, and Mr. Shaw had brought this to the attention of Mr. Romano in March 2017 and again in March 2018. In both 2017 and 2018, Mr. Romano said that he would speak to Mr. Shaw and the other employee, which Mr. Romano did not do. Mr. Romano had told Mr. Shaw that he, "need[ed] to be like a duck and let this roll off his back."

14.     On November 15, 2018, Mr. Shaw, Mr. Renibe, and Aye Vines, an African American female, were terminated. Mr. Shaw, Mr. Renibe, and Ms. Vines were called to a separate building, which held additional office space and was a secure location on the University of Maryland campus, and were given notice of their termination, stripped of their building access, and prohibited from returning to their offices to collect their personal belongings. This building, separate from the main building, had been evacuated primarily for this interaction. Engineers in Mr. Shaw's office space were told to close and lock their doors. A plain clothed officer was waiting in the room adjacent to the room in which Mr. Shaw, Mr. Renibe, and Ms. Vines were terminated. The layoffs that occurred at CASL in April 2013 were handled very differently than the layoffs of Mr. Shaw, Mr. Renibe, and Aye Vines. The employees who were laid off in 2013 were informed within their own building; not required to travel to a different location escorted by an armed officer; not prohibited from returning to their offices to collect their personal belongings; and not

5

immediately stripped of their building access before even receiving their layoff letters. The University claimed that the presence of an armed officer was necessary for Mr. Shaw, Mr. Renibe, and Ms. Vines because they were not known to Mr. Farley, so he did not know how they would react to their being laid off and that UMD feared they would have a weapon. However, there was no advance notice given to Mr. Shaw, Mr. Renibe, and Ms. Vines about their impending layoffs. Furthermore, such "fear" was not demonstrated by the University of Maryland laying off other employees. The other laid off employees received advanced notice of their layoffs were allowed to stay in the building, and were informed as a group, whereas Mr. Shaw, Mr. Renibe, and Ms. Vines did not receive advanced notice, were not allowed to stay in the building, and were isolated and told separately. The way in which Mr. Shaw, Mr. Renibe, and Ms. Vines were treated was hostile and discriminatory, though this is consistent with how they were treated while employed by UMD, such as being called the names of other UMD employees who were also African American.

15.     In contrast to how Mr. Shaw, Mr. Renibe, and Ms. Vines were treated, a fourth employee was also terminated at the same time through a layoff, but this fourth employee was notified of her layoff in Mr. Farley's office and was not subjected to the same treatment as Mr. Shaw, Mr. Renibe, and Ms. Vines, despite this fourth employee having the same access as Mr. Shaw had. Mr. Shaw, Mr. Renibe, and Ms. Vines were told of their layoffs in an off-site location. In addition, a formal debriefing is required for security purposes when an employee loses a position. The UMD did not perform this debriefing for Mr. Shaw. Mr. Shaw's layoff was administered by Mr. Farley, but it is unclear which individual or individuals at the University of Maryland made the decision to layoff Mr. Shaw. However, the decision to deactivate Mr. Shaw's

top-secret status was made by Mr. Romano, and such deactivation is not required by the government.

16.     Mr. Shaw's layoff was a pretext for a discriminatory termination. The stated reason for his termination was budgetary constraints, but Mr. Shaw was the lowest paid engineer on his team, so terminating him did not make financial sense for the stated reason of budgetary constraints. Mr. Shaw was paid approximately eight to ten thousand dollars ($8,000.00 - $10,000.00) less than the other engineers in his section. In addition, though CASL claimed to be experiencing financial difficulties, an IT employee's reclassification was approved and granted at the same time of Mr. Shaw's termination.

17.     On February 5, 2019, Mr. Shaw, Mr. Renibe, and Ms. Vines (collectively, "grievants") requested a hearing at Step II of the University System of Maryland Grievance Procedure and alleged discrimination in the University of Maryland's decision to lay them off. The grievants subsequently also alleged discrimination in the decision to deactivate their security clearances.

18.     On July 1, 2019, Mr. Shaw, Mr. Renibe, and Ms. Vines' grievance was upheld by Hearing Examiner Andrea LeWinter: "this Hearing Examiner will require [the University of Maryland] to pay the grievants their full salaries until their clearances are fully reinstated, not to exceed a year from the initial date of the layoff letter or November 15, 2019. If, as of the writing of this Decision, the clearances have already been reinstated or if the clearances are reinstated prior to November 15, 2019, then the grievant(s) shall provide [the University of Maryland] the date upon which he and/or she received/s notification of the reinstatement and [the University of Maryland] shall compensate the grievant(s) for the period between the end of the 90-day layoff notification, February 13, 2019, and the clearance reinstatement. The rationale for the limitation

of one year on the payment award is derived from the grievants' repeated request for an award of an additional nine months of payment based on their assertion that this amount of time should be sufficient for clearance reinstatement." To date, the University has not complied with the decision of the Hearing Examiner to pay Mr. Shaw until his security clearance is reinstated. In addition, the hearing did not address the discrimination that Mr. Shaw, Mr. Renibe, and Ms. Vines faced other than providing a record of UMD admitting its bias. UMD highlighted the issue of clearance but not discrimination.

19.     Mr. Shaw has suffered substantial losses as a result of his termination from employment. He was the primary income source for his family and his daughter was enrolled at the University of Maryland L.E.A.P. Program in the University Hearing and Speech Center. She has been diagnosed with autism and, until the time of Mr. Shaw's termination, was making good progress in developing her speech. Mr. Shaw's son also has autism and requires special needs education as well as occupational and speech therapy. Mr. Shaw's insurance at the University of Maryland had covered the therapies of his children in full and, since his termination, he has not been able to attain insurance with the same level of coverage. Since February 2019, Mr. Shaw has been forced to pay out of pocket for all costs for therapy for his children. Furthermore, Mr. Shaw's wife has a heart condition, and his current insurance does not fully cover her ability to see a specialist. In addition, during his tenure at the University of Maryland, likely due to work related stress, Mr. Shaw developed a chronic illness, Focal Segmental Glomerulosclerosis and has been diagnosed with Stage 4 renal disease and kidney transplant imminent, hypertension and obesity. Plaintiff's termination has adversely impacted his marriage, and he has lost the ability to utilize the remission of tuition for himself and his family.

**COUNT I**
**Violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII")**
**42 U.S.C. § 2000e *et seq.***
**Race Discrimination**
**Disparate Treatment and Hostile Work Environment**

20.     Plaintiff realleges and incorporates by reference the above paragraphs as if fully stated herein.

21.     At all pertinent times, Defendant was an employer subject to the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

22.     At all pertinent times, Plaintiff was an employee entitled to protection under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

23.     Title VII of the Civil Rights Act of 1964 prohibits discrimination on the basis of race with respect to an employee's compensation, terms, conditions, or privileges of employment.

24.     Defendant violated Title VII of the Civil Rights Act of 1964 when it discriminated against Plaintiff Shaw on the basis of race between 2014 and 2018 when: Mr. Romano told Mr. Shaw that he does not know what he does, despite being his direct supervisor; Mr. Romano gave Mr. Shaw an inaccurate performance review and failed to address his objections to his review; Mr. Romano promoted another engineer non-competitively over Mr. Shaw, even though Mr. Romano had previously assured Mr. Shaw that the PRD would not affect his promotion; Mr. Shaw was excluded by Mr. Romano from a project, even though that project affected his work and even though engineers were expected and supposed to communicate with each other; other engineers excluded Mr. Shaw from planning, even though engineers were expected and supposed to communicate with each other; Mr. Shaw's work contributions and achievements were belittled and/or not acknowledged; another engineer, who was not Mr. Shaw's supervisor, closely monitored Mr. Shaw's work and attempted to portray him in a negative light; Mr. Romano

repeatedly ignored Mr. Shaw's complaints about that engineer and requests for help; the University of Maryland terminated Mr. Shaw's employment in November 2018 and deactivated Mr. Shaw's clearance without providing a rationale and even after assurances from Mr. Farley that it would not, which led to Mr. Shaw mistakenly stating that he had clearance when applying to other jobs; Mr. Shaw was treated differently from previous employees who were laid off as well as a fourth employee who was laid off at the same time; Mr. Shaw was treated as if he were hostile when he was laid off; and the University of Maryland chose to deactivate Mr. Shaw's top secret status without being required to do so. The actions taken against Mr. Shaw and, specifically, the termination, was based on race because he faced a pattern of discrimination over a number of years before he was terminated and was selected for termination with two other African American individuals; the reasons given for the termination are false; the University did not follow its own policies in his termination as evidenced by the decision of the Hearing Examiner; Mr. Shaw was treated differently than similarly situated employees in his department and even differently in the manner in which he was terminated; and the Defendant has provided a shifting articulation of the reason for his termination.

25.     As a direct and proximate result of Defendant's actions, Plaintiff Shaw has suffered emotional distress and pain and suffering.

26.     Defendant's actions directly and proximately caused Plaintiff Shaw to suffer and to continue to suffer loss of income and other financial benefits, emotional distress, pain, suffering, stress, humiliation, loss of enjoyment of life, and damage to his reputation and career, and further loss of future professional opportunities.

27.     Defendant engaged in its discriminatory actions described above with malice or with reckless indifference to Plaintiff Shaw's legal rights.

28.     Defendant had no legitimate business reason for any such acts.

29.     Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other discriminatory practices that are not yet fully known.

**COUNT II**
**Violation of the Civil Rights Act of 1866**
**42 U.S.C. § 1981**
**Race Discrimination**
**Disparate Treatment and Hostile Work Environment**

30.      Plaintiff realleges and incorporates by reference the above paragraphs as if fully stated herein.

31.     Section 1981 prohibits discrimination on the basis of race in the making and enforcing of contracts, with respect to an employee's compensation, terms, conditions, or privileges of employment.

32.     Defendant violated Section 1981 when it discriminated against Plaintiff Shaw on the basis of race between 2014 and 2018 when: Mr. Romano told Mr. Shaw that he does not know what he does, despite being his direct supervisor; Mr. Romano gave Mr. Shaw an inaccurate performance review and failed to address his objections to his review;  Mr. Romano promoted another engineer non-competitively over Mr. Shaw, even though Mr. Romano had previously assured Mr. Shaw that the PRD would not affect his promotion; Mr. Shaw was excluded by Mr. Romano from a project, even though that project affected his work and even though engineers were expected and supposed to communicate with each other; other engineers excluded Mr. Shaw from planning, even though engineers were expected and supposed to communicate with each other; Mr. Shaw's work contributions and achievements were belittled and/or not acknowledged; another engineer, who was not Mr. Shaw's supervisor, closely monitored Mr. Shaw's work and

11

attempted to portray him in a negative light; Mr. Romano repeatedly ignored Mr. Shaw's complaints about that engineer and requests for help; the University of Maryland terminated Mr. Shaw's employment in November 2018 and deactivated Mr. Shaw's clearance without providing a rationale and even after assurances from Mr. Farley that it would not, which led to Mr. Shaw mistakenly stating that he had clearance when applying to other jobs; Mr. Shaw was treated differently from previous employees who were laid off as well as a fourth employee who was laid off at the same time; Mr. Shaw was treated as if he were hostile when he was laid off; and the University of Maryland chose to deactivate Mr. Shaw's top secret status without being required to do so. The actions taken against Mr. Shaw, and specifically the termination was based on race because he faced a pattern of discrimination over a number of years before he was terminated and was selected for termination with two other African American individuals; the reasons given for the termination are false; the University did not follow its own policies in his termination as evidenced by the decision of the Hearing Examiner; Mr. Shaw was treated differently than similarly situated employees in his department an even differently in the manner in which he was terminated; and the Defendant has provided a shifting articulation of the reason for his termination.

33.    As a direct and proximate result of Defendant's actions, Plaintiff Shaw has suffered emotional distress and pain and suffering.

34.    Defendant's actions directly and proximately caused Plaintiff Shaw to suffer and to continue to suffer loss of income and other financial benefits, emotional distress, pain, suffering, stress, humiliation, loss of enjoyment of life, and damage to his reputation and career, and further loss of future professional opportunities.

35.    Defendant engaged in its discriminatory actions described above with malice or with reckless indifference to Plaintiff Shaw's legal rights.

36.     Defendant had no legitimate business reason for any such acts.

37.     Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other discriminatory practices that are not yet fully known.

## COUNT III
### Breach of Contract

38.      Plaintiff realleges and incorporates by reference the above paragraphs as if fully stated herein.

39.     Plaintiff's employment was subject to certain terms and conditions including a grievance process which was binding on the Defendant.

40.     Plaintiff Shaw filed a grievance after his termination and a Hearing Examiner held a hearing and issued an award requiring the University to pay Mr. Shaw all wages due until his security clearance was fully reinstated, not to exceed a year from the layoff letter or November 15, 2019. Despite the award of the Hearing Examiner, the University has failed to pay Mr. Shaw the wages due.

41.     As a direct and proximate result of Defendant's actions, Plaintiff Shaw has suffered loss of income.

42.     Defendant's actions directly and proximately caused Plaintiff Shaw to suffer and to continue to suffer loss of income and other financial benefits, emotional distress, pain, suffering, stress, humiliation, loss of enjoyment of life, and damage to his reputation and career, and further loss of future professional opportunities.

43.     Defendant engaged in its discriminatory actions described above with malice or with reckless indifference to Plaintiff Shaw's legal rights.

13

44.     Defendant had no legitimate business reason for any such acts.

45.     Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other discriminatory practices that are not yet fully known.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Shaw prays as follows:

A.      That the Court issue an Order declaring Defendant violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981, and committed breach of contract and declaring Plaintiff eligible to receive equitable and other relief;

B.      Enter judgment against Defendant;

C.      Issue a permanent injunction prohibiting Defendant from engaging in any further acts of discrimination, harassment, and retaliation;

D.      Enter judgment in favor of Plaintiff against Defendant for all equitable monetary damages available under the law;

E.      Order Defendant to refrain from any action against Plaintiff, or any other person, for participating in or supporting this case in any manner;

F.      Order Defendant, individually and collectively, to pay compensatory and punitive damages in an amount no less than five million dollars ($ 5,000,000.00);

G.      Order Defendant to pay Plaintiff's medical retirement;

H.      Order Defendant to pay Plaintiff's reasonable attorneys' fees, expert fees, and costs; and

14

I.      Order Defendant to pay pre-judgment and post-judgment interest as provided by law.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all claims against Defendant.

Date: August 5, 2021                    Respectfully submitted,

                    */s/ David A. Branch*
                    David A. Branch, Maryland Bar No. 22862
                    Law Office of David A. Branch & Associates, PLLC
                    1828 L Street, N.W., Suite 820
                    Washington, D.C. 20036
                    Phone: (202) 785-2805
                    Fax: (202) 785-0289
                    Email: davidbranch@dbranchlaw.com