## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
(Southern Division)

| | | |
|---|---|---|
| **DUANE SHAW** *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | **Case No. GLS 21-1986** |
| **UNIVERSITY OF MARYLAND,** | : | |
| **COLLEGE PARK** *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## <u>MEMORANDUM OPINION</u>

Pending before this Court[1] is "Defendants' Motion for Summary Judgment" ("Motion") filed by the University of Maryland, College Park ("UMCP"), John Romano, Laurie Locascio, John Farley, and Steven Fetter (collectively "Defendants"). (ECF No. 68). Duane Shaw and Zanaki Renibe (collectively "Plaintiffs") have filed "Plaintiffs' Opposition to Defendants' Motion for Summary Judgement." ("Opposition") (ECF Nos. 77, 84). Defendants have filed a "Reply Memorandum of Law in Support of Defendants' Motion for Summary Judgment" ("Reply") in response to Plaintiffs' Opposition. (ECF No. 80). Accordingly, briefing on the issues is complete. The Court finds no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023).

For the reasons set forth below, the Motion is **GRANTED IN PART AND DENIED IN PART**.

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of this Court to conduct all further proceedings in this case, to include through trial, entry of final judgment, and resolution of post-judgment proceedings. (ECF No. 10).

## I.    BACKGROUND

### A.  Procedural Background

Plaintiff Shaw filed suit against Defendant UMCP. (Civ. No. 21-1986, "*Shaw* Case," ECF No. 1). Subsequently, Plaintiff Shaw filed an Amended Complaint advancing the following claims: Count I against UMCP for race-based disparate treatment and hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*; Count II against John Romano and John Farley for race-based disparate treatment and hostile work environment, in violation of 42 U.S.C. § 1981; Count III against UMCP for breach of contract. (*Shaw* Case, ECF No. 27, "Amended Complaint"). Thereafter, Defendants filed a motion to dismiss, which Plaintiff Shaw opposed, and Defendants filed a Reply. (*Shaw* Case, ECF Nos. 38, 41, 42). By Memorandum Opinion and Order, this Court dismissed Counts II and III in their entirety, and the hostile work environment claim under Title VII in Count I. (*Shaw* Case, ECF Nos. 43, 44). Thus, Count I is the sole remaining claim in the *Shaw* Case, namely the disparate treatment claim under Title VII, related to Plaintiff Shaw's selection for termination and the manner in which he was terminated. (*Id.*).

Plaintiff Renibe filed suit against Defendants UMCP, John Romano, and John Farley. (Civ. No. DKC 22-618, "*Renibe* Case," ECF No. 1). Subsequently, Plaintiff Renibe filed an Amended Complaint advancing the following claims: Count I against UMCP for race-based disparate treatment and hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*; Count II against John Romano, John Farley, Laurie Locascio, and Steven Fetter ("Individual Defendants") for race-based disparate treatment and hostile work environment, in violation of 42 U.S.C. §§ 1981 and 1983. (*Renibe* Case, ECF No. 8, "Amended Complaint"). Thereafter, Defendants filed a motion to dismiss, which Plaintiff Renibe opposed, and Defendants

filed a Reply. (*Renibe* Case, ECF No. 12, 15, 16). By Memorandum Opinion and Order, the district judge then assigned to the case dismissed Plaintiff Renibe's Title VII hostile work environment claim asserted in Count I. (*Renibe* Case, ECF No. 18). Thus, the remaining claims in the *Renibe* Case are: Count I against UMCP for disparate treatment under Title VII challenging the selection and manner of Plaintiff Renibe's termination, and Count II against the Individual Defendants for prospective injunctive relief under 42 U.S.C. §§ 1981 and 1983. (*Id.*).

The *Shaw* Case and the *Renibe* Case have been consolidated. (*Shaw* Case, ECF No. 55). Scheduling Orders were entered, discovery occurred and concluded, and Defendants filed a motion for summary judgment. (ECF Nos. 14, 49, 60, 62, 68).

**B. Factual Background[2]**

1. Evidence Relevant to Both Plaintiffs[3]

   a. *Undisputed Facts*

UMCP operated a University Affiliated Research Center ("UARC"), the Center for Advanced Study of Language ("CASL"), from 2003 to 2017. (Deposition of Zanaki Renibe, "Renibe Dep.," 25:1-5, Pl. JA0006; Deposition of Steven Fetter PhD, "Fetter Dep.," 12:11-16, Pl. JA0061). As part of the UARC, CASL could contract with federal agencies within the Department of Defense ("DOD") to conduct research consistent with the agency's research priorities. (Fetter

---

[2] The Court views all evidence in the light most favorable to the Plaintiffs, the nonmoving parties. *Sedar v. Reston Town Ctr. Prop.,* LLC, 988 F.3d 756, 761 (4th Cir. 2021).

[3] The Court ordered the parties to submit a singular Joint Appendix ("JA"), which required them to collaborate to include all the factual evidence upon which they relied in their briefing. (ECF No. 65). Contrary to the Court's clear directive, Plaintiffs inexplicably elected to submit their own JA ("Pl. JA"), and Defendants inexplicably elected to submit their own JA ("Def. JA"). (ECF Nos. 80-1, 84-1). Despite their clear violation of the order, the Court exercised its discretion and reviewed both parties' Joint Appendices. The Court finds that the first 326 pages of Defendants' 344-page JA are contained within Plaintiffs' JA. Accordingly, the Court will cite to Plaintiffs' JA as it includes the majority of the exhibits relied upon by both parties. To the extent that the Defendants rely on exhibits not included in Plaintiffs' JA, the Court will cite to the Defendants' JA. Finally, the Court will not consider any materials submitted that run afoul of Fed. R. Civ. P. 56(c)(1)(A) and the law. To that end, the Court declines to consider Plaintiffs' JA0718-755. *See also* Section III.A.

Dep. 13:2-6, Pl. JA0062). CASL's original agency sponsor was the National Security Agency ("NSA") within the DOD. (Fetter Dep. 12:12-23, Pl. JA006; Deposition of Laurie Locascio, "Locascio Dep.," 19:7-9, 38:20-23, Pl. JA0236, 255; Renibe Dep. 25:1-5, 25:15-16, Pl. JA0006). Within CASL, the agency sponsor maintained a highly secure area, the Sensitive Compartmented Information Facility ("SCIF"), in which sensitive and classified research was conducted. (Locascio Dep. 21:21-22, Pl. JA0238; Deposition of Duane Shaw, "Shaw Dep.," 34:20-22, 35:1-2, Pl. JA0107-08). Most of the work within the SCIF was classified. (Shaw Dep. 34:20-22, 35:1-2, Pl. JA0107-08). To work within the SCIF, employees were required to have a special security clearance. (Locascio Dep. 22:14-18, Pl. JA0239). In addition, the contract with the agency sponsor required UMCP to maintain certain security personnel positions to operate the SCIF. (Locascio Dep. 22:14-18, Pl. JA0239).

In April 2018, the agency sponsor changed from the NSA to a new unnamed agency sponsor within the DOD. (Fetter Dep. 12:12-23, Pl. JA0061; Locascio Dep. 19:7-9, 38:20-23, Pl. JA0236, 255; Renibe Dep. 25:1-5, 25:15-16, Pl. JA0006). After the change in agency sponsor, research goals shifted and CASL ceased existing and a new department, Applied Research Labs and Industrial Security ("ARLIS"), was formed in its place. (Pl. JA0328; Fetter Dep. 13:3-6, Pl. JA0062; Deposition of John Farley, "Farley Dep.," 46:6-10, Pl. JA0225; Renibe Dep. 25:15-16, Pl. JA0006).

During the transition between sponsors, UMCP fired "dozens" of research faculty in 2017 and 2018. (Fetter. Dep. 13:21-24, 14:12-15, Pl. JA0062-63). The research faculty were notified of their termination by Dr. Steven Fetter, who was the acting Interim Director of CASL at the time. (Fetter Dep. 13:7-11, Pl. JA0062). Dr. Fetter notified the research faculty in 2017 that their positions would be terminated in 2018. (Renibe Dep. 52:11-18, Pl. JA0025; Fetter Dep. 13:7-11,

Pl. JA0060). After being notified of their termination, the research faculty continued to work and maintained their security clearances and access to the classified networks and documents within the SCIF. (Renibe Dep. 54:10-18, Pl. JA0027).

In addition, in 2018, Dr. Fetter, determined that it was necessary to reduce the budget for support staff and that a reduction-in-force ("RIF") was required. (Fetter Dep. 30:20-25, 31:1, 31:22-25, 32:15, Pl. JA0069-71). The plan for how to conduct the RIF was outlined by UMCP senior management officials, including Dr. Fetter and Mr. Farley. (Fetter Dep. 43:10-17, Pl. JA0079). Thereafter, four exempt staff employees were terminated as part of a RIF that occurred in or about November 2018: the Plaintiffs, Ms. Vines, and Ms. Thangpijaigul were ultimately fired. (Fetter Dep. 39:14-18, 40:2-5, Pl. JA0075-76; Farley Dep. 11:17-25, 17:1-14, 17:19-24, Pl. JA0263, 473, 479). Three of the four terminated employees, the Plaintiffs and Ms. Vines, are African American. (Shaw Dep. 128:13-20, Pl. JA0190). Ms. Thangpijaigul is Asian. (Farley Dep. 28:14-15, Pl. JA0207). At the time of this November 2018 RIF, there were only six African American employees out of one-hundred-and-sixty-five employees working at UMCP. (Shaw Dep. 132:2-8, Pl. JA0194). Three of the six African American employees were terminated as part of this November 2018 RIF. (Shaw Dep. 132:12-16, Pl. JA0194).

In contrast to the terminations of the research faculty, Mr. Farley, not Dr. Fetter, fired Plaintiffs, Ms. Vines, and Ms. Thangpijaigul. (Farley Dep. 11:17-25, Pl. JA0473). The November 2018 RIF was the only RIF involving CASL that Mr. Farley was involved in at UMCP. (Farley Dep. 11:17-25, 12:22-24, 13:10-14, Pl. JA0473-75). Mr. Farley terminated the Plaintiffs and Ms. Vines in the Patapsco Building on November 15, 2018 with Ms. Byrd, a specialist from UMCP Human Resources, present. (Renibe Dep. 48:6-22, 49:1-14, Pl. JA0021-22; Shaw Dep. 64:20-22, 65:1-11, 69:8-14, Pl. JA0137-38, 142; Farley Dep. 27:19-23, Pl. JA0206). Initially, Mr. Farley

requested UMCP police presence outside the Patapsco Building during the terminations. (Farley Dep. 34:2-9, Pl. JA213; Pl. JA0290). Subsequently, a UMCP plain-clothes officer was present in the office suite during the terminations of the Plaintiffs and Ms. Vines. (Shaw Dep. 67:5-12, Pl. JA0140; Renibe Dep. 48:17-22, Pl. JA0021; Farley Dep. 34:10-17, Pl. JA0213). Police presence was not requested or approved for any of the other firings that were part of the RIF that year. (Fetter Dep. 57:3-6, Pl. JA0453).

A week or two after the terminations of Plaintiffs and Ms. Vines, Mr. Farley fired Ms. Thangpijaigul not in the Patapsco Building, but in his office. (Farley Dep. 28:10-13, 28:17-19, Pl. JA0207). Ms. Thangpijaigul was not African American, but Asian. (Farley Dep. 28:14-15, Pl. JA0207). According to Mr. Farley, Ms. Thangpijaigul did not come to work the day that he terminated Plaintiffs. (Farley Dep. 29:2-18, Pl. JA0208). Upon her return to work approximately a week or two later, Mr. Farley made the decision to fire Ms. Thangpijaigul in his office. (Farley Dep. 29:21-24, Pl. JA0208). Mr. Farley did not request police presence when he fired Ms. Thangpijaigul. (Farley Dep. 40:22-25, 41:6-13, Pl. JA0219-20). The Plaintiffs, Ms. Vines, and Ms. Thangpijaigul had any top-secret status and security clearance removed and were placed on involuntary administrative leave. (Plaintiff Shaw's Responses to Defendants' First Set of Interrogatories, "Shaw Ans. to Interrog.," at No. 9, Pl. JA0313; Defendant UMCP's Answers to Plaintiff Renibe's Interrogatories, "UMCP Ans. to Renibe Interrog.," at No. 14, Pl. JA0284-85; Sworn Declaration of Duane Shaw, "Shaw Declaration," ¶ 11, Pl. JA0706; Farley Dep. 29:16-17, Pl. JA0208).

After being fired, the Plaintiffs and Ms. Vines engaged in UMCP's Grievance Procedure from 2018 to 2019. (Shaw Ans. to Interrog., at No. 7, Pl. JA0312). As part of the Grievance Procedure, an arbitrator (the "Hearing Examiner") presided over a hearing and ultimately, on July

1, 2019, issued a written opinion in favor of the Plaintiffs and Ms. Vines. (*Id.*).

    *b.  Facts Relevant to UMCP's Financial Picture*

  The parties appear to dispute: (a) whether UMCP was undergoing financial pressure in 2018, which led to the articulated need for a RIF; and (b)whether a December 2017 Indefinite Delivery Indefinite Quantity ("IDIQ") award remedied any financial distress, enabling UMCP to keep Plaintiffs employed.

  Defendants maintain that UMCP underwent financial difficulties due to the switch in agency sponsors that necessitated a RIF. (Fetter Dep. 38:12-17, Pl. JA0074). Dr. Locascio, the Vice President for Research at UMCP, testified that the previous agency sponsor had paid for the operating costs of CASL, now ARLIS, but that the new agency sponsor did not, thus UMCP absorbed those expenses. (Locascio Dep., 11:2-4. 19:4-9, Pl. JA0225, 236). To ensure that UMCP did not fall into deficit, Dr. Fetter determined that it was necessary to reduce the budget for support staff. (Fetter Dep. 31:22-25, 32:15, Pl. JA0070-71). Ultimately, UMCP fell into a deficit within the first year under the contract with the new agency sponsor. (Locascio Dep. 19:15-18; JA0236). UMCP's financial sheets reflect that between 2017 and 2018, UMCP's operating budget significantly decrease and by the end of 2018, the deficit was expected to be approximately $1.2 million. (Pl. JA0295-96; Locascio Dep. 19:4-18, Pl. JA0236).

  In contrast, Plaintiffs contend that UMCP had acquired funding that would support their continued employment, namely, that UMCP received a $91 million IDIQ award on December 19, 2017 under a UARC contract. Thus, Plaintiffs did not need to be terminated. (Renibe Dep. 73:6-12, Pl. JA0040; Shaw Dep. 76:17-21, Pl. JA0182). Defendants counter that an IDIQ is not an award of funding. According to Dr. Fetter, an IDIQ is a legal framework that provides for the award of funding up to a specified amount over a specified period of time. (Fetter Dep. 18:21-25,

19:1-3, Pl. JA0065-66). Dr. Locascio testified that to obtain funding under the IDIQ, UMCP had to first identify work to be done before the sponsor would transfer the funds to complete that work. (Locascio Dep. 20:10-16, Pl. JA0237). As such, UMCP only brought in minimal amounts of funding to conduct research and no funding to cover support services and building costs. (*Id.*).

Defendant Renibe testified that to obtain funding under an IDIQ there are "checks and balances and offices that have to approve" the funding, but that once UMCP goes through the approval process, the $91 million is transmitted to UMCP "as needed." (Renibe Dep. 106:19-22, 107:1-8, Pl. JA0052-53). Plaintiff Renibe admitted that he does not know "when and how" the money is transmitted to UMCP. (Renibe Dep. 107:19-21, Pl. JA0053).

Plaintiff Renibe also testified that in a January 2, 2019 email, Dr. Locascio reported that UMCP had all necessary funding and support from the new sponsor, but then in a January 5, 2019 email to Plaintiffs, she stated that UMCP lacked the funds to maintain Plaintiffs positions. (Renibe Dep. 75:10-22, 76:1-9, Pl. JA0042-43). The parties did not include the emails in either of the Joint Appendices.

    2. Plaintiff Shaw

        a. *Undisputed Facts*

Plaintiff Shaw began working at UMCP on or around October 2012 as a research systems engineer. (Shaw Dep. 11:16-19, 13:11-15, Pl. JA0095, 97). As a UMCP employee, Plaintiff Shaw obtained a top-secret security clearance and specialized access that allowed him to work on different programs and projects involving classified information. (Shaw Dep. 28:12-22, 29:1-4, Pl. JA0101-02). By 2018, there was no place or system within the facility that Plaintiff Shaw did not have access to, including the SCIF. (Shaw Dep. 32:21-22, 33:1-2, Pl. JA0105-06). While employed at UMCP, Plaintiff Shaw worked with two other engineers, Mr. Shoemaker and Mr. Gaucian, who

are not African American, under the supervision of Mr. Romano. (Deposition of John Romano, "Romano Dep." 17:13-17, Pl. JA0579). The specialized responsibilities of the three engineers were separate and distinct; Plaintiff Shaw supported security initiatives, Mr. Shoemaker supported the network, and Mr. Gaucian worked in directory and operating systems. (Romano Dep. 21:23-25, 22:1-7, Pl. JA0270-71). As part of Plaintiff Shaw's responsibilities supporting security initiatives at UMCP, Plaintiff Shaw was one of the communications security ("COMSEC") certified personnel, a position that was required to operate the COMSEC room within the SCIF. (Shaw Dep. 77:16-22, 78-1-2, Pl. JA183-84; Romano Dep. 28:1-8, 28:16-20, Pl. JA0590). There is a minimum three-person requirement to operate the COMSEC room within the SCIF. (Shaw Dep. 77:16-22, 78-1-2, Pl. JA183-84). The other two engineers and Mr. Romano were not certified to perform COMSEC duties. (Romano Dep. 28:18, Pl. JA0590).

Plaintiff Shaw was the only African American engineer on his team. (Shaw Dep. 127:18-20, Pl. JA0189). In addition, Plaintiff Shaw was also the lowest paid engineer on his team and was paid $8,000 to $10,000 less than the other two engineers. (Shaw Dep. 134:22, 135:1-3, Pl. JA0196-97; Shaw Ans. to Interrog., at No. 12, Pl. JA0387; Shaw Declaration, ¶ 12, Pl. JA0706). Prior to being fired, one of Plaintiff Shaw's White counterparts received "consistent bumps to his salary" despite his supervisor making clear that no promotions would be given. (Shaw Ans. to Interrog., at No. 12, Pl. JA0387).

On November 15, 2018, Plaintiff Shaw received a call from Mr. Farley requesting Plaintiff Shaw's presence in another building, the Patapsco Building. (Shaw Dep. 64:20-22, Pl. JA0137). When Plaintiff Shaw arrived at the Patapsco Building, there was a plain-clothes UMCP police officer in the office suite. (Shaw Dep. 66:3-8, 67:5-12, Pl. JA0139-40). Plaintiff Shaw then met with Mr. Farley and Ms. Byrd, who notified Plaintiff Shaw that he was fired. (Shaw Dep. 69:8-10,

Pl. JA0142). Plaintiff Shaw was then asked to turn over his keys and was prohibited from returning to his workstation in the other building. (Shaw Dep. 69:11-12, Pl. JA0142; Shaw Declaration, ¶ 10, Pl. JA0705-06). UMCP did not conduct a formal security debriefing prior to or following Plaintiff Shaw's termination. (Shaw Declaration, ¶11, Pl. JA0706). Subsequently, Plaintiff Shaw had his security clearance deactivated despite being informed that his termination would not affect his clearance during the 90-day notice period. (Shaw Dep., 69:8-12, Pl. JA0142; Shaw Declaration, ¶ 11, Pl. JA0706). The two other engineers on Plaintiff Shaw's team were not terminated. (Shaw Dep. 127:18-20, Pl. JA0189).

> b. *Disputed Facts*

The parties dispute the following: (1) whether Mr. Romano and the remaining engineers could absorb Plaintiff Shaw's responsibilities; (2) whether Plaintiff Shaw's position was "key" and "required" by the contract with the agency sponsor; (3) whether UMCP followed the proper protocol when terminating Plaintiff Shaw; and (4) whether UMCP police presence in the office suite was warranted when he was fired.

First, Plaintiff Shaw contends that he held security-related duties beyond those of his colleagues, and that after he was fired UMCP was left with engineers without the security-related qualifications that Plaintiff Shaw held. (Shaw Dep. 78:17-18, Pl. JA0184). In response, Defendants maintain that Mr. Romano and the remaining two engineers were able to absorb Plaintiff Shaw's responsibilities. (Fetter Dep. 25:4-11, Pl. JA0204). Mr. Farley testified that, as he understood it, the other two individuals could perform Plaintiff Shaw's responsibilities, but Plaintiff Shaw did not have the experience and certifications to perform the other individuals' responsibilities. (Farley Dep. 25:15-22, Pl. JA0204). Dr. Fetter testified that Mr. Romano held the necessary certifications to supervise and operate the SCIF, and that he "believes" that he confirmed with the agency

sponsor that Mr. Romano could absorb the responsibilities of the fired Plaintiffs. (Fetter Dep. 47:13-25, 49:1-5, Pl. JA0081, 83). Plaintiff Shaw maintains that his COMSEC responsibilities could not be absorbed by his colleagues because they were not certified to perform COMSEC duties. (Shaw Dep. 52:15-20, 77:10-22, 78:1-2, Pl. JA0125, 183-84). Mr. Romano confirmed in his deposition that neither he nor the other two engineers were COMSEC certified. (Romano Dep. 28:18, Pl. JA0590).

Second, the parties dispute whether Plaintiff Shaw's position was "key" and "required" by the contract with the agency sponsor. According to Plaintiff Shaw, there was a minimum three-person requirement by the agency sponsor to operate the COMSEC room within the SCIF. (Shaw Dep. 77:16-22, 78:1-2, Pl. JA0183-84). As the COMSEC alternate, Plaintiff Shaw's role was "key" and "required" under the government contract. (Shaw Dep. 78:17-18, Pl. JA0184). Dr. Locascio admits that working within the SCIF requires special security clearance because somebody is handling sensitive information and that there are certain positions that are required by the contract. (Locascio Dep. 22:8-22, Pl. JA0239). Dr. Locascio maintains that such positions are not named by person but are named by position. (*Id.*). Dr. Locascio does not know if the position held by Plaintiff Shaw was listed in the contract. (Locascio Dep. 22:23-25, 23:1-3, Pl. JA0239-40).

Third, the parties dispute whether UMCP followed the proper protocol when terminating Plaintiff Shaw. According to Plaintiffs, when terminating "key" personnel under the contract, UMCP was required to notify the agency sponsor 90 days in advance of a change in the required key personnel; UMCP never did so. (Renibe Dep. 67:1-16, Pl. JA0034). UMCP never informed the "security attachment (sic)" at the Pentagon in accordance with policy. (*Id.*). Moreover, a formal debriefing is required when UMCP terminates an employee with a security clearance. (Shaw Declaration, ¶ 11, Pl. JA0706; Renibe Declaration, ¶ 23, Pl. JA0714). Defendants counter that the

agency sponsor approved of Plaintiff Shaw's termination. Dr. Locascio assumes that the agency sponsor approved of the transfer of Plaintiff Shaw's security duties to Mr. Romano and of Plaintiff Shaw's termination because, had the agency sponsor not approved, then UMCP would not have been permitted to continue to operate the SCIF. (Locascio Dep. 41:1-6, Pl. JA0258).

Fourth, the parties dispute whether UMCP had legitimate, non-discriminatory reasons for terminating Plaintiff Shaw in a different building than where he worked and whether police presence was necessary. According to Dr. Fetter, the decision to terminate Plaintiffs in a separate building was because: (1) exempt staff employees are not permitted to work after being given notice; and (2) the nature of the positions held by Plaintiffs and Ms. Vines involved access to highly sensitive information and systems. (Fetter Dep. 51:14-25, 52:1-14, Pl. JA0085-86). Dr. Fetter admitted that there were discussions about having police present during the firings but does not recall when that discussion occurred. (Fetter Dep. 54:17-19, Pl. JA0088). Dr. Fetter also admitted that this was the first time that a police officer was present at RIF terminations. (Fetter Dep. 57:3-6, Pl. JA0453). Mr. Farley testified that it was his usual practice to have police presence outside the building in which he is administering a layoff. (Farley Dep. 33:21-25, Pl. JA0212). Mr. Farley further testified that police presence in the office suite was due to the insistence of UMCP's police chief. (Farley Dep. 34:10-17, 38:9-12, Pl. JA0213, 217). Plaintiff Shaw testified that he has not engaged in any threatening behavior against UMCP and thus there was no need for armed police presence. (Shaw Dep. 137:1-14, Pl. JA0199). Plaintiff Shaw further stated that his colleagues were instructed to lock their doors the day that he was notified of his firing. (Shaw Ans. to Interrog., at No. 9, Pl. JA0313). Mr. Farley admitted that there were no complaints that Plaintiff Shaw engaged in any conduct that was perceived as threatening. (Farley Dep. 38:9-12, Pl. JA0217). Mr. Farley further conceded that had he only been laying off Ms. Vines and Plaintiff

Shaw, and not Plaintiff Renibe, too, the UMCP police officer would not have been stationed in the office suite. (Farley Dep. 40:3-10, 40:19-21, Pl. JA0219).

    3.   <u>Plaintiff Renibe</u>

       *a.  Undisputed Facts*

In 2009, Plaintiff Renibe began working at UMCP as a security specialist. (Renibe Dep. 38:2-5, Pl. JA0010). Plaintiff Renibe's role as a UMCP security specialist required him to obtain a security clearance because his position gave him access to classified documents, networks, and information within the SCIF. (Renibe Dep. 36:15-22, Pl. JA0008). By the end of 2009, Plaintiff Renibe had been promoted to program management specialist. (Renibe Dep. 38:16-19, Pl. JA0010). In 2012, Plaintiff Renibe applied for and obtained a position as a security coordinator at UMCP. (Renibe Dep. 41:8-11, 41:14-22, Pl. JA0041). Accordingly, Plaintiff Renibe's responsibilities increased; namely, Plaintiff Renibe controlled and maintained the UMCP security policies established by the DOD and intelligence community at UARC. (Renibe Dep. 42:12-18, Pl. JA0014). As a security coordinator, Plaintiff Renibe also held the following positions: facility security officer ("FSO"); Secret Compartmented Information Contractor Special Security Officer ("SCICSSO"); and NSA COMSEC account manager. (Renibe Dep. 43:5-16, Pl. JA0015). In these roles, Plaintiff Renibe acted as the liaison between the agency sponsor (NSA) and the CASL, now ARLIS, at the UARC facility. (Renibe Dep. 44:21-22, 45:1-2, Pl. JA0016-17). Mr. Renibe was the only SCICSSO and COMSEC account manager. (Renibe Dep. 105:1-11, Pl. JA0051). Moreover, Plaintiff Renibe was credentialed by the DOD and his clearances were sponsored by the NSA. (Sworn Declaration of Zanaki Renibe, "Renibe Declaration," ¶ 5, Pl. JA0710). While employed at UMCP, Plaintiff Renibe's salary was between $75,000 and $80,000. (Renibe Declaration, ¶ 12, Pl. JA0711).

The day of his firing, Plaintiff Renibe received a phone call from Mr. Farley summoning him to the Patapsco Building. (Renibe Dep. 47:22, 48:1-5, Pl. JA0020-21). Upon arrival, Plaintiff Renibe observed a plain-clothes UMCP police officer in the office suite. (Renibe Dep. 48:17-22, Pl. JA0021). Therein, Mr. Farley and Ms. Byrd terminated Plaintiff Renibe. (Renibe Dep. 48:7-22, Pl. JA0021). After being notified that he was fired, Plaintiff Renibe was not permitted to return to his workstation in the other building to collect his belongings. (Renibe Dep. 49:15-22, 50:1-9, Pl. JA0022-23). UMCP did not conduct a formal security debriefing prior to or following Plaintiff Renibe's termination. (Renibe Declaration ¶ 23, Pl. JA0714). Subsequently, Plaintiff Renibe had his security clearance deactivated despite Mr. Farley's representations that Plaintiff Renibe would maintain his clearances during the requisite 90-day notice period (i.e., until in or about February 2019). (Renibe Declaration ¶¶ 9, 23, Pl. JA0711, 714).

> b.  *Disputed Facts*

The parties dispute the following: (1) whether Mr. Romano was credentialed to perform Plaintiff Renibe's job responsibilities; (2) whether Plaintiff Renibe's position was "key" and "required" by the contract with the agency sponsor; (3) whether UMCP followed the proper protocol when terminating Plaintiff Renibe; and (4) whether UMCP police presence in the office suite was warranted when he was fired.

First, Plaintiff Renibe maintains that Mr. Romano did not hold the requisite credentials to perform his responsibilities; thus, UMCP fired him in violation of the agency contract. (Renibe Dep. 66:13-22, 67:1-16, Pl. JA0033-34). Specifically, Plaintiff Renibe contends that pursuant to the UARC contract, UMCP was required to maintain security, namely a COMSEC account manager, and Mr. Renibe was the only one. (Renibe Dep. 66:13-22, Pl. JA0033). Defendants counter that UMCP concluded that Mr. Romano could perform Plaintiff Renibe's job

responsibilities and that Mr. Romano had the ability to be certified to do so. (Fetter Dep. 24:13-18, 24:21-23, Pl. JA0203). Dr. Fetter testified that Mr. Romano held the necessary certifications to supervise and operate the SCIF and that he "believes" that he confirmed with the agency sponsor that Mr. Romano could indeed absorb the responsibilities of the fired employees. (Fetter Dep. 47:13-25, 49:1-5, Pl. JA0081, 83). However, Mr. Farley testified that he does not recall whether there were discussions confirming that Mr. Romano could perform Plaintiff Renibe's responsibilities (Farley Dep. 25:4-11, Pl. JA0204). Mr. Romano confirmed in his deposition that he was not, and is not, COMSEC certified. (Romano Dep. 28:18, Pl. JA0590).

Second, Defendants maintain that Plaintiff Renibe's position was neither "key" nor "required" under the contract with the agency sponsor. (UMCP Ans. Interrog. at No. 11, JA0284). Dr. Fetter admits that Plaintiff Renibe's position may have been listed in the contract when describing security arrangements, but contends that the position was not required by the contract. (Fetter Dep. 33:13-17, Pl. JA0072). Plaintiff Renibe avers that his position was "key" and "required" under the contract with the agency sponsor. (Renibe Dep. 74:9-11, Pl. JA0041). Specifically, Plaintiff Renibe contends that he performed key security functions necessary to operate UARC. (Renibe Dep. 66:13-22, Pl. JA0033). Plaintiff Renibe was the only NSA-designated SO, SCICSSO, and COMSEC account manager. (Renibe Dep. 105:1-11, Pl. JA0051).

Third, the parties dispute whether UMCP followed the proper protocol when terminating Plaintiff Renibe. According to Plaintiff Renibe, because he was "key" and "required" personnel, UMCP was required to inform the agency sponsor 90 days in advance of a change in the required personnel. (Renibe Dep. 67:1-16, Pl. JA0034). UMCP never informed the "security attachment (sic)" at the Pentagon in accordance with policy. (*Id.*). Moreover, a formal debriefing is required when UMCP terminates an employee with security clearance. (Shaw Declaration, ¶ 11, Pl.

JA0706; Renibe Declaration, ¶ 23, Pl. JA0714). Defendants counter that the agency sponsor approved of Plaintiff Renibe's termination. Dr. Locascio assumes that the sponsor approved the transfer of Plaintiff Renibe's security duties to Mr. Romano and Plaintiff Renibe's termination because, had the agency sponsor not approved, then UMCP would not have been permitted to continue to operate the SCIF. (Locascio Dep. 41:1-6, Pl. JA0258).

Fourth, the parties dispute that sufficient security concerns existed to warrant the manner in which Plaintiff Renibe was terminated. Defendants maintain that there were legitimate concerns about how Plaintiff Renibe would react to being fired. In the initial email requesting UMCP police presence, Mr. Farley expressed that he was "slightly concerned with [Plaintiff Renibe's] potential reaction" and that Plaintiff Renibe had told Mr. Farley that he "is ex-PGD." (Pl. JA0290). Mr. Braniff, a member of CASL leadership, responded to that email chain stating that Plaintiff Renibe "is a former golden gloves boxer in NYC, was some kind of Air Force Special Operations airman, and has a physical intensity about him that warrants [UMCP police] presence." (Pl. JA0291). Defendants also rely on an alleged incident with a human resources employee, Ms. Madoo, in which Defendants claim that Ms. Madoo felt threatened by Plaintiff Renibe. (Farley Dep. 36:5-10, 36:21-25, 37:1, Pl. JA0215-16). Plaintiff Renibe disputes UMCP's articulated reasons for having police presence at his termination, contending that during his entire employment tenure at UMCP he never acted inappropriately even when faced with hostile conditions. (Renibe Declaration, ¶ 12, Pl. JA0712).

## II.    THE LAW

### A. Summary Judgment

Motions for summary judgment shall be granted only if there are no genuine issues as to any material fact, such that the moving party is entitled to judgment as a matter of law. Fed. R.

Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A fact is material if it might affect the outcome of the suit under the governing law." *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016).

The moving party bears the burden of showing that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a); *Wit Man Tom v. Hospitality Ventures, LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020). The burden can be satisfied through the submission of, e.g., deposition transcripts, answers to interrogatories, admissions, declarations, stipulations, and affidavits. *Celotex Corp.*, 477 U.S. at 323; *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984); *see also* Fed. R. Civ. P. 56(c)(1)(A).

The Court must construe the facts and documentary materials submitted by the parties in the light most favorable to the party opposing the motion. *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021). To defeat a motion for summary judgment, the nonmoving party cannot simply rest on allegations averred in its opposition or other brief. Rather, the nonmoving party must demonstrate that specific material *facts* exist that give rise to a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 323 (emphasis added); *see also* Fed. R. Civ. P. 56(c)(1).

Summary judgment is inappropriate if sufficient evidence exists from which a reasonable jury may decide in favor of the non-movant. *Anderson*, 477 U.S. at 250. "[I]n the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility." *U.S. Equal Emp. Opportunity Comm'n v. Ecology Servs., Inc.*, 447 F. Supp. 3d 420, 437 (D. Md. 2020) (citing *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006), and then citing *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002)). However, the "mere existence of a scintilla of evidence in support of the [non-movant]" is

insufficient to create an issue of material fact. *Anderson*, 477 U.S. at 248.

### B. Title VII

Title VII prohibits employers from "discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

In a Title VII case, a plaintiff has "two methods of proof [available] to demonstrate that she suffered intentional employment discrimination: (1) the mixed motive framework or (2) the pretext framework set forth in *McDonnell Douglas Corp. v. Green.*" *Foster v. Summer Vill. Cmty. Ass'n, Inc.*, 520 F. Supp. 3d 734, 741 (D. Md. 2021) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)); *Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019), *as amended* (Mar. 26, 2019). Under either the mixed-motive or *McDonnell Douglas* framework, a plaintiff "always bears the ultimate burden of persuading the court that [she] has been the victim of intentional discrimination . . . regardless of the type of evidence offered . . . in support [of her] discrimination claim (direct, circumstantial, or evidence of pretext), or [regardless of] whether she proceeds under a mixed-motive or single-motive [i.e. pretext] framework." *Foster*, 520 F. Supp. 3d at 742 (internal citations and quotations omitted) (alteration in the original).

The Fourth Circuit has required that, when advancing a claim under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination. *Sempowich v. Tactile Sys. Tech., Inc.,* 19 F.4th 643, 649 (4th Cir. 2021). The "precise formulation" of a *prima facie* case will vary depending on different factual situations, but generally, a plaintiff is "required to show that the employer took adverse action against an employee who was qualified for employment, under circumstances which give rise to an inference of unlawful discrimination."

*Hartman v. Univ. of Md. at Baltimore*, Civ. No. ELH 10-2041, 2012 WL 3544730, at *13 (D. Md. Aug. 14, 2012) (further citations omitted).

Assuming that a plaintiff establishes a *prima facie* case of discrimination, the burden then shifts to the defendant-employer to offer a legitimate nondiscriminatory reason for taking adverse action against the plaintiff. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993); *Foster*, 520 F. Supp. 3d at 742. Once a defendant has proffered a legitimate nondiscriminatory reason, the burden shifts back to the plaintiff to prove that "'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Rodgers*, 586 F. Supp.3d at 444 (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

It is worth noting that the *McDonnell Douglas* framework is a "'procedural device, designed only to establish an order of proof and production' **at trial**." *Rodgers v. Eagle All.*, 586 F. Supp. 3d 398, 433 (D. Md. 2022) (emphasis added) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 521). Thus, at the summary judgment stage, the framework is "intended to be flexible . . . designed to uncover 'circumstances which give rise to an inference of unlawful discrimination.'" *Rodgers*, 586 F. Supp. 3d at 433 (quoting *Burdine*, 450 U.S. at 253). Thus, in order to survive summary judgment, a plaintiff "need only present a genuine issue of material fact as to one liability theory" (mixed motive or *McDonnell Douglas*); the reviewing court "need not decide whether a plaintiff's discrimination claims would similarly survive under the alternative analysis. *Foster*, 520 F.Supp.3d at 742.

## C.  Sections 1981 and 1983

Section 1981 provides, in relevant part, that "[a]ll persons within the Jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The phrase "'make and enforce contracts' includes the

making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Courts have held that, as is true with Title VII, Section 1981 "prohibits, *inter alia*, discrimination in employment on the basis of race." *Weathersbee v. Baltimore City Fire Dep't*, 970 F. Supp. 2d 418, 428 (D. Md. 2013) (further citations omitted).

Section 1983 provides a cause of action against any "person" who, under color of state law, subjects a person within the jurisdiction of the United States to the "deprivation of any rights, privileges, or immunities secured by the Constitution" and federal law. 42 U.S.C. § 1983; *see also Weathersbee*, 970 F. Supp. 2d at 428. Section 1983 is not a source of substantive rights but "'a method for vindicating federal rights elsewhere conferred.'" *Weathersbee*, 970 F. Supp. 2d at 428 (quoting *Albright v. Oliver*, 510 U.S. 266, 271 (1994)). Thus, Section 1983 is often the method by which a plaintiff may vindicate rights secured by, *inter alia*, Section 1981. *See, e.g.*, *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989) (holding that Section 1983 is the sole vehicle by which a plaintiff may seek damages for a violation of Section 1981).

When a plaintiff advances either a Section 1981 or a Section 1983 employment discrimination claim, the elements required to establish a *prima facie* case are the same as in a Title VII discrimination claim. *Gairola v. Com. of Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985).

## III.    DISCUSSION

### A.   Plaintiffs' Title VII Claims

Plaintiffs Shaw and Renibe assert that Defendants violated Title VII by impermissibly considering race: (1) when selecting them for termination; (2) as evidenced by the manner in which they were terminated. (*Shaw* Case, Amended Complaint, p. 11; *Renibe* Case, Amended Complaint,

pp. 11-12).

In the Motion, Defendants largely contend that Plaintiffs' Title VII claims fail for three principal reasons. First, Plaintiffs fail to establish a *prima facie* case of intentional discrimination based on race; i.e., that Plaintiffs have failed to demonstrate that their selection for termination and the manner in which they were terminated were predicated on their race. Second, even though Plaintiffs have failed to meet their burden of establishing a *prima facie* case of intentional discrimination, Defendants have nonetheless offered legitimate nondiscriminatory reasons to explain why Plaintiffs were selected for termination and why they were terminated in a certain manner. Third, having provided legitimate reasons for Plaintiffs' termination, Plaintiffs have failed to establish that a genuine dispute of material fact exists as to whether Defendants' proffered reasons for termination are a pretext and, therefore, "unworthy of credence." (Motion, pp. 7-17).

Plaintiffs counter that the Defendants intentionally discriminated against them based on their race in deciding to terminate them and in how they were terminated. (Opposition, pp. 19-27).

The Court first finds that, in their brief, Plaintiffs are proceeding under the *McDonnell Douglas* burden-shifting framework. (*Id.*). Thus, the Court need not decide whether Plaintiffs' discriminatory termination claims would survive under a "mixed-motive" method of proof. *See Foster,* 520 F. Supp. 3d at 742.

Next, as a preliminary matter, Plaintiffs attempt to rely upon the Hearing Examiner's findings to defeat summary judgment. (Pl. JA0629-700). When considering a motion for summary judgment, however, courts are only allowed to consider evidence that would be admissible at trial. *Harvey v. Velasquez Contractor, Inc.*, Civ. No. GLS 19-1573, 2020 WL 5628976 at *2 (D. Md. Sept. 21, 2020) (explaining that "to be entitled to consideration at the summary judgment stage, the evidence supporting the facts set forth by the parties must be such as would be **admissible** in

evidence" at trial (emphasis in original) (citing *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 349 (D. Md. 2011)); *see also* Fed. R. Civ. P. 56(c)(2). The Court holds that the Hearing Examiner's findings would not be admissible at trial because they constitute inadmissible hearsay and are unduly prejudicial. *See Bell v. Univ. Md. Coll. Park. Campus Facilities Mgmt.*, Civ. No. PX 17-1655, 2020 WL 978659 at *4 ( D. Md. Feb. 28, 2020) (excluding an EEOC reasonable cause determination because it came with the imprimatur of government approval and was inadmissible hearsay); *see also Price v. Grasonville Volunteer Fire Dep't*, Civ. No. ELH 14-1989, 2016 WL 6277666, at *4 (D. Md. Oct. 26, 2016) (finding that by admitting an EEOC determination, a jury could potentially give it more weight than should otherwise be accorded, and thus it was unduly prejudicial). Accordingly, the Court declines to consider the Hearing Examiner's findings in resolving the Motion.

The Court will now address in turn all discriminatory termination claims as to each individual Plaintiff.

1. The Plaintiffs' Wrongful Termination Claims: Selection for Termination

   a. *The Parties' Arguments*

Defendants first contend that Plaintiffs cannot establish a *prima facie* case of race-based discrimination as to their selection for termination because Plaintiffs' positions were eliminated as part of a RIF, which means that the Plaintiffs cannot demonstrate that they were replaced by an individual outside their protected class. Alternatively, even assuming that the Plaintiffs have established a *prima facie* case of discriminatory selection, Defendants have offered a legitimate nondiscriminatory reason for firing Plaintiffs. Specifically, Defendants aver that: (1) UMCP underwent financial pressure that required a RIF consistent with UMCP policy permitting RIFs in the event of a reduction in funding; and (2) UMCP selected Plaintiffs for termination because it

determined that Mr. Romano and the remaining employees could absorb the Plaintiffs' job responsibilities and that the agency sponsor approved of the firings. Next, according to Defendants, Plaintiffs have not met their burden to prove that Defendants' stated reasons for their terminations are untrue and are a pretext for discrimination. (Motion, p. 10, 14; Reply, pp. 6-8).[4]

Although not entirely clear, the Plaintiffs appear to assert that they have established *prima facie* evidence of discriminatory selection for termination based on race. First, Plaintiffs contend that the *McDonnell Douglas* framework is a flexible standard that permits multiple methods of establishing a *prima facie* case. Relatedly, Plaintiffs maintain that courts in this Circuit have assumed without deciding that a plaintiff has met his/her burden in order to address the issue of whether unlawful discrimination occurred. Plaintiffs also suggest that they need not show that their positions were filled or remained opened; rather, they aver that they have sufficiently made out a *prima facie* case because: (i) UMCP employed only six African American employees and terminated three of them in the RIF; (ii) Plaintiffs held security positions required by the contract with the agency sponsor; and (iii) the remaining employees lacked the requisite security certifications and qualification that both Plaintiffs held. (Opposition, pp. 19-23). Thus, Defendants' stated reasons for terminating Plaintiffs are a pretext for discriminatory animus.[5]

### b. Prima Facie Case: Modified McDonnell Douglas Framework

Ordinarily, to establish a Title VII wrongful selection for termination claim under the *McDonnell Douglas* framework, a plaintiff must show: (1) membership of a protected class; (2) adverse employment action; (3) satisfactory job performance at a level that met the employer's

---

[4] Defendants contend that, in addition to failing to make out a *prima facie* case, Plaintiff Shaw conceded that his selection for termination was itself lawful. (Motion, pp. 8-9, Pl. JA0136). Plaintiff Shaw counters that he has not conceded that his termination was lawful. (Opposition, p. 21; Shaw Declaration, ¶13; Pl. JA0706). The Court finds Plaintiff Shaw's opinion to be irrelevant. What matters is whether Plaintiff Shaw provides a sufficient factual foundation. *See* Fed. R. Civ. P. 56(c)(1)(A); *see also Celotex Corp.*, 477 U.S. at 323.

[5] Plaintiffs also argue that the Court should adopt the Hearing Examiner's findings from the UMCP Grievance Procedure. (Opposition, p. 20). The Court declines to do so.

legitimate expectations; and (4) that the position was filled by similarly qualified applicants outside the protected class. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003); *see also Bush v. Frederick Cnty. Pub. Sch.*, Civ. No. JRR 21-1190, 2023 WL 170410, at *9 (D. Md. Jan. 12, 2023), *aff'd*, No. 23-1127, 2024 WL 639255 (4th Cir. Feb. 15, 2024).

In the instant case, the parties do not dispute that Plaintiffs Shaw and Renibe are members of a protected class, were performing satisfactorily, and suffered an adverse employment action. Thus, the first three elements of a wrongful selection for termination claim are not at issue. According to the Defendants, the Plaintiffs were selected for termination due to a RIF. (Fetter Dep. 30:20-25, 31:1, Pl. JA0069-70; Locascio Dep. 23:24-25, 24:1-6, Pl. JA0240-41). Thus, the only issue ripe for resolution relates to the fourth element of a wrongful termination claim in a case where the position was eliminated as part of a RIF.

In this District, in the event of a RIF—which results in there being no position to be filled by anyone—a plaintiff can satisfy the fourth element of a *prima facie* case by introducing evidence that the "process of [terminating a plaintiff or having selected a plaintiff for termination] produced a residual work force of persons in the group containing some unprotected persons who were performing at a level lower than that at which [the employee] was performing." *Vincent v. Medstar S. Md. Hosp. Ctr.*, Civ No. TDC 16-1438, 2017 WL 3668756, at *5 (D. Md. Aug. 22, 2017) (alteration in the original) (citing *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315 (4th Cir. 1993)); *see also Corti v. Storage Tech. Corp.*, 304 F.3d 336, 341 n.6 (4th Cir. 2002). It is worth noting that the fourth element may also be proven by showing that "the employer did not treat the protected status neutrally, or [that] there were other circumstances giving rise to an inference of discrimination." *Dugan v. Albemarle Cnty. Sch. Bd.*, 293 F.3d 716, 720-21 (4th Cir. 2002); *see also Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998).

24

In sum, the law requires the Court to utilize a modified M*cDonnell Douglas* framework. Thus, the Court agrees with Plaintiffs that their inability to show that their positions were filled or remained open is not relevant to establishing their *prima facie* case.[6]

    i. <u>Plaintiff Shaw: *Prima Facie* Evidence</u>[7]

The issue is whether Plaintiff Shaw met his burden under the fourth element of the modified *McDonnell Douglas prima facie* case. As held above, in order to meet the fourth element, Plaintiff Shaw must produce evidence that: (1) the process of termination or selection for termination produced a residual work force with individuals outside Plaintiff Shaw's protected class performing at a lower level than Plaintiff Shaw; **or** (2) UMCP did not treat race neutrally or there were other circumstances that give rise to an inference of discrimination.

The Court finds that, when construing the facts in the light most favorable to Plaintiff Shaw and drawing all reasonable inferences in his favor, Plaintiff Shaw has met his burden under both methods of proving the fourth element of a *prima facie* case in a RIF context.

As to the first method, the Court finds instructive *Vincent v. Medstar Southern Maryland Hospital Center*. In *Vincent*, the plaintiff, who was laid off as part of a RIF and passed over in favor of a colleague outside her protected class, put forth evidence that she had certain skills and proficiencies in tasks that her favored colleague did not possess. 2017 WL 3668756, at *6. The court in *Vincent* thus found that the plaintiff had met her *prima facie* burden by showing that the residual workforce contained individuals outside her protected class performing at a level lower

---

[6] Because the Court will apply the modified *McDonnell Douglas* framework, it need not address the Defendants' arguments regarding whether Plaintiffs improperly relied upon caselaw cited in the Opposition. (Reply, pp. 2-3).

[7] Plaintiffs are correct that there is caselaw in this Circuit where courts have assumed, without deciding, that a *prima facie* case exists in order to address whether a plaintiff has met his/her burden of establishing that the employer's stated reasons for termination were pretextual. *See, e.g., Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007); *Hux v. City of Newport News*, 451 F.3d 311, 314 (4th Cir. 2006); *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006) (en banc); *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 319-20 (4th Cir. 2005). The Court has reviewed these cases and finds them factually distinguishable.

than her. *Id.*

Here, the Court finds that Plaintiff Shaw has put forth sufficient evidence to meet his *prima facie* burden. First, there are genuine issues of material fact regarding whether the remaining research engineers could perform Plaintiff Shaw's responsibilities. For example, Mr. Farley testified that Mr. Romano had advised him that the remaining two engineers were able to perform Plaintiff Shaw's responsibilities. (Farley Dep. 25:15-22, 26:5, Pl. JA0204-05). In contrast, Mr. Romano testified that neither he nor the remaining two engineers were certified in COMSEC which, according to Mr. Romano, constituted the majority of Plaintiff Shaw's responsibilities. (Romano Dep. 28:1-8, 28:16-20, Pl. JA0590). Indeed, Mr. Romano reported that the specialized responsibilities of the three engineers on the team were separate and distinct: Plaintiff Shaw supported security initiatives, Mr. Shoemaker supported the network, and Mr. Gaucian worked in directory and operating systems. (Romano Dep. 21:23-25, 22:1-7, Pl. JA0270-71). Thus, when viewing the facts in the light most favorable to Plaintiff Shaw and drawing all reasonable inferences in his favor, a reasonable jury could find that the residual workforce contained individuals outside Plaintiff Shaw's protected class who were unable to perform Plaintiff Shaw's COMSEC responsibilities at the same level as Plaintiff Shaw, if at all.

As to the second method of proving the fourth element of a *prima facie* case, the Court similarly finds that Plaintiff Shaw has met his *prima facie* burden. It is undisputed that UMCP terminated half of its African American employees during the November 2018 RIF, including Plaintiff Shaw. (Shaw Dep. 132:2-16, Pl. JA0194). Moreover, as held above, a reasonable jury could find that Plaintiff Shaw possessed skills and proficiencies that his colleagues did not possess. Thus, when viewing the facts in the light most favorable to Plaintiff Shaw and drawing all reasonable inferences in his favor, a reasonable jury could conclude that UMCP did not treat race

neutrally when selecting Plaintiff Shaw for termination or there were other circumstances that give rise to an inference of discrimination.

In sum, the Court finds Plaintiff Shaw has met his *prima facie* burden and will deny summary judgment as to that argument.

ii.    Plaintiff Renibe: *Prima Facie* Evidence

The Court finds that Plaintiff Renibe has made out a *prima facie* case, adopting here its analysis and rationale articulated in Section III.A.1.b.i, *supra*.

As to the first method of proving the fourth element, there are genuine issues of material fact as to whether the remaining workforce contained individuals outside Plaintiff Renibe's protected class performing at a lower level than Plaintiff Renibe. After Plaintiff Renibe's position was eliminated, the remaining workforce in security included individuals outside his protected class, such as Mr. Romano, who were unable to perform a number of Plaintiff Renibe's security responsibilities. (UMCP Ans. to Renibe Interrog., at No. 3, Pl. JA0280; Romano Dep. 28:1-8, Pl. JA0590). Specifically, Plaintiff Renibe was the COMSEC account manager and security officer. (Renibe Dep. 44:21-22, 45:1-2, 105:1-11, Pl. JA0016-17, 51). Mr. Romano, who absorbed Plaintiff Renibe's security responsibilities, testified that he was not COMSEC certified. (Romano Dep. 28:1-8, 28:16-20, Pl. JA0590). Thus, when viewing the facts in the light most favorable to Plaintiff Renibe and drawing all reasonable inferences in his favor, a reasonable jury could find that the residual workforce of security personnel contained individuals outside Plaintiff Renibe's protected class who were unable to perform Plaintiff Renibe's COMSEC responsibilities at the same level as Plaintiff Renibe, if at all.

As to the second method of proving the fourth element of a *prima facie* case under the modified *McDonnell Douglas* framework, the Court finds that Plaintiff Renibe has met his *prima*

*facie* burden. As held above, a reasonable jury could find that Plaintiff Renibe had skills and proficiencies that his colleagues did not possess. Furthermore, it is undisputed that UMCP terminated half of its African American employees during the November 2018 RIF, including Plaintiff Renibe. (Shaw Dep. 132:2-16, Pl. JA0194; Renibe Dep. 48:7-22, Pl. JA0021). Thus, when viewing the facts in the light most favorable to Plaintiff Renibe and drawing all reasonable inferences in his favor, a reasonable jury could conclude that UMCP did not treat race neutrally when selecting Plaintiff Renibe for termination or there were other circumstances that give rise to an inference of discrimination.

In sum, the Court finds that Plaintiff Renibe has met his *prima facie* burden and will deny summary judgment as to that argument.

### c. Legitimate Nondiscriminatory Reasons and Pretext

Under the second step of the *McDonnell Douglas* framework, once a plaintiff has met his *prima facie* burden, the burden of production shifts to the defendant employer who "must produce (but not prove) a legitimate, non-discriminatory reason for the adverse employment action." *Hibschman v. Regents of Univ. of Md. Sys.*, No. 98-1870, 2000 WL 232015 at *3 (4th Cir. Mar. 1, 2000) (unpublished opinion) (quoting *Burdine*, 450 U.S. at 254). In doing so, a defendant employer "must clearly set forth, through the introduction of admissible evidence" the reasons for its decision. *Burdine*, 450 U.S. at 254-55. Notably, a defendant "need not persuade the court that it was actually motivated by the proffered reasons." *Hibschman*, 2000 WL 232015 at *3 (quoting *Burdine*, 450 U.S. at 254); *see also Rodgers*, 586 F. Supp. 3d at 443. If the defendant employer carries its burden, then "the presumption raised by the *prima facie* case is rebutted." *Burdine*, 450 U.S. at 255; *St. Mary's Honor Ctr.*, 509 U.S. at 507.

Here, the Defendants have produced deposition testimony from Dr. Locascio and Dr. Fetter

that due to financial pressures, UMCP conducted a RIF and selected Plaintiffs for termination after determining that their responsibilities could be absorbed by Mr. Romano and the remaining employees. (Locascio Dep. 23:24-25, 24:1-6, Pl. JA0240-41; Fetter Dep. 30:20-25, 31:1-25, JA0069-70). Accordingly, Defendants have produced admissible evidence of its proffered legitimate nondiscriminatory reasons.

After a defendant has produced evidence of a legitimate nondiscriminatory reason, the burden shifts back to a plaintiff to show, by a preponderance of the evidence, that a defendant's stated reasons are pretext for discrimination. *See St. Mary's Honor Ctr.*, 509 U.S. at 507; *Rodgers*, 586 F. Supp. 3d at 435; *Hibschman*, 2000 WL 232015 at *3. In order to establish pretext, a plaintiff must "generate sufficient evidence that the ground for firing [plaintiff] was pretext for discriminatory animus." *Foster*, 520 F. Supp. 3d at 744. Put another way, a plaintiff must show that the stated reason "was false, and that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515. Once a plaintiff "offers such circumstantial evidence, the case must be decided by a trier of fact and cannot be resolved on summary judgment." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019). Because the Defendants produced evidence that UMCP had a legitimate reason for the RIF and its selection of Plaintiffs for termination, the burden shifts back to Plaintiffs to produce evidence that Defendants' proffered reasons for termination are pretext for discriminatory animus.

Defendants contend that both Plaintiffs have failed to rebut the proffered legitimate nondiscriminatory reasons for UMCP's selecting Plaintiffs for termination, namely: (1) that UMCP policy permits RIFs when there is a reduction in funding; and (2) that Plaintiffs were selected for termination after UMCP, with agency sponsor approval, determined that the remaining employees could perform the Plaintiffs' responsibilities. (Motion, pp. 10-13; Reply, pp. 6-8).

In the Opposition, although not entirely clear to the Court, Plaintiffs appear to argue that the reasons articulated by Defendants are false for three reasons. First, there was sufficient funding for Plaintiffs' positions because Dr. Fetter testified that the positions were funded for the upcoming fiscal year and Dr. Locascio reported successful fundraising to support government contracts. Second, UMCP was not permitted terminate Plaintiffs because Plaintiffs were credentialed by the NSA to perform responsibilities that were "key" and "required" by the contract and that Mr. Romano, who absorbed their responsibilities, did not hold those credentials. Relatedly, UMCP failed to follow the appropriate agency procedure when terminating its "key" and "required" personnel because it failed to conduct the requisite security debriefing and notify the agency sponsor 90 days in advance of taking action. Third, the reasons proffered by Defendants were not financially reasonable because they terminated UMCP's lowest paid employees. Specifically, Plaintiffs maintain that they were paid significantly less than Mr. Romano. (Opposition, pp. 5, 8-10, 15, 23-26). In sum, Plaintiffs contend that Defendants have failed to provide an adequate non-discriminatory explanation as to why the Plaintiffs were selected for termination over others who did not hold the security credentials that Plaintiffs held, and who were paid higher salaries.

In the Reply, Defendants maintain that there was insufficient funding to support Plaintiffs' employment, that Plaintiffs misconstrued the evidence in the record regarding UMCP's funding, and that UMCP determined that the Plaintiffs positions were not required to operate the SCIF. Ultimately, Defendants submit that UMCP did provide an explanation, namely that it concluded that Plaintiffs' responsibilities could be absorbed by Mr. Romano and the remaining employees. (Reply, pp. 13-14).

     i.   <u>Both Plaintiffs</u>

First, the Court finds that even when viewing the facts in the light most favorable to

Plaintiffs, no reasonable jury could not find that UMCP underwent financial difficulties in 2018. According to Dr. Locascio, the financial pressure was due to a change in the funding model under the new sponsor; specifically, the old sponsor had paid the operating costs of CASL/ARLIS whereas the new sponsor did not cover such operating costs. (Locascio Dep. 18:24-25, 19:1-6, Pl. JA00235-36). The undisputed evidence reflects that between 2017 and 2018, UMCP's operating finances significantly decrease and by 2018, the deficit was expected to be approximately $1.2 million. (Pl. JA0295-96; Locascio Dep. 19:4-18, Pl. JA0236; Shaw Dep. 76:17-21, Pl. JA0182).

Contrary to Plaintiffs' assertions, Dr. Fetter's testimony does not contradict this. Dr. Fetter testified that it was necessary to reduce expenditures to avoid a deficit and that while UMCP retained funding for the academic fiscal year (July 1st to June 30th), there was uncertainty regarding the federal fiscal year (October 1st to September 30th). (Fetter Dep. 45:10-13, 45:17-24, Pl. JA0441). Thus, to ensure that UMCP did not fall into a deficit, Dr. Fetter determined that it was necessary to reduce the budget for support staff. (Fetter Dep. 31:22-25, 32:15, Pl. JA0070-71). Ultimately, UMCP fell into a deficit within the first year under the contract with the new agency sponsor. (Locascio Dep. 19:15-18; JA0236). Plaintiffs have pointed to no evidence in the record to rebut Defendants' evidence that from in or about 2017 until in or about 2019, UMCP underwent financial pressure, due to the change in agency sponsor, that required it to conduct a RIF.

Next, regarding the IDIQ,[8] Dr. Fetter testified that an IDIQ is a legal framework that provides for the award of funding up to a specified amount over a specified period of time. (Fetter Dep. 18:21-25, 19:1-3, Pl. JA0065-66). Dr. Locascio also testified that to obtain funding under the IDIQ, UMCP had to first identify work to be done before the sponsor would transfer the funding

---

[8] In the Opposition, Plaintiffs merely assert that Dr. Locascio reported "successful funding" without directing the Court to evidence of such "successful funding." (Opposition, p. 5). In the Reply, Defendants assume that Plaintiffs are referring to the IDIQ award. To the extent that Plaintiffs rely on the January 2, 2019 email referenced by Plaintiff Renibe, that email is not in either JA. Thus, the Court cannot consider it. *See* Fed. R. Civ. P. 56(c)(1)(A).

to complete that work. (Locascio Dep. 20:10-16, Pl. JA0237). As such, UMCP only brought in minimal amounts of funding to support research and no funding to cover support services and building costs. (*Id.*). Defendant Renibe generally testified that to obtain funding under an IDIQ there are "checks and balances and offices that have to approve" the funding, but once UMCP goes through the approval process, the $91 million is transmitted to UMCP "as needed." (Renibe Dep. 106:19-22, 107:1-8, Pl. JA0052-53). Plaintiff Renibe admitted that he does not know "when and how" the money is transmitted to UMCP. (Renibe Dep. 107:19-21, Pl. JA0053). Thus, even when construing the facts in Plaintiff Renibe's favor, a reasonable jury could only conclude that Plaintiff Renibe does not really know material facts about how the IDIQ process operates related to his position. Accordingly, his opinions are unfounded opinions and thus insufficient to create a genuine issue of material fact. *Accord Lewis v. Inova Health Care*, Civ. No. LMB 23-1716, 2024 WL 4438474, at *7 (E.D. Va. Oct. 7, 2024) (finding that to "the extent that plaintiff's arguments rely on her beliefs, for which she has not submitted a factual foundation, they do not create a genuine dispute of material fact").

In sum, even when viewing the facts in the light most favorable to Plaintiffs Shaw and Renibe, the Court cannot find that there is a genuine issue of material fact that UMCP underwent financial difficulties from 2017 through 2018 that led to UMCP administering a RIF and no reasonable juror could so conclude.

Nonetheless, the Court's inquiry does not end there. The Court will next address the issue of whether UMCP's proffered reason for **selecting** Plaintiffs Shaw and Renibe for termination was false and a pretext for race-based discrimination.

    ii.  <u>Plaintiff Shaw</u>

When viewing the evidence in the light most favorable to Plaintiff Shaw and drawing all

reasonable inferences in his favor, a reasonable juror could conclude that UMCP's reasons are false and a pretext for racial animus.

First, there are genuine issues of material fact regarding whether Plaintiff Shaw's position was "key" and "required." It is undisputed that there are certain positions UMCP was required to maintain under the agency contract. (Locascio Dep. 22:8-22, Pl. JA0239). Indeed, the record reflects that Plaintiff Shaw performed COMSEC duties required by the agency sponsor to operate the COMSEC room within the SCIF. (Shaw Dep. 77:10-22, 78:1-2, Pl. JA0183-84; Renibe Dep. 66:13-22, Pl. JA0033; Pl. JA0608). In order to operate the COMSEC room within the SCIF, UMCP was required to maintain three COMSEC certified individuals. (Renibe Dep. 66:13-22, Pl. JA0033; Shaw Dep. 77:10-22, 78:1-2, Pl. JA0183-84). These individuals were Plaintiff Renibe, Plaintiff Shaw, and Ms. Vines. (Pl. JA0608). A reasonable juror could thus conclude that Plaintiff Shaw occupied a "key" and "required" position.

Next, there are genuine issues of material fact regarding whether Plaintiff Shaw's responsibilities could be absorbed by the remaining engineers and Mr. Romano. Dr. Fetter testified that UMCP determined that it could operate without Plaintiff Shaw because Mr. Romano could absorb his responsibilities. (Fetter Dep. 31:22-25, 32:1-5, Pl. JA0070-71). However, Mr. Romano himself made clear that he was not COMSEC certified, nor has he ever been COMSEC certified, and that the remaining engineers on the team similarly lacked COMSEC certification. (Romano Dep. 28:1-8, Pl. JA0590). Notably, a reasonable jury could find that after the termination of the Plaintiffs and Ms. Vines, there were no individuals credentialed to operate the COMSEC room within the SCIF. (Renibe Dep. 66:13-22, Pl. JA0033; Shaw Dep. 77:10-12, Pl. JA0183; JA0608). Thus, a reasonable jury could conclude that Mr. Romano and the remaining engineers could not absorb Plaintiff Shaw's job responsibilities.

In addition, the Court finds that there remains a genuine dispute of material fact regarding whether the agency sponsor was notified and approved of Plaintiff Shaw's termination. While Defendants point to Dr. Fetter's testimony to support their argument, upon review of the deposition transcript, the record reveals only that Dr. Fetter "believes" that he confirmed Mr. Romano held the requisite credentials with the sponsor,[9] not whether the sponsor approved the termination of the Plaintiffs. (Fetter Dep. 49:1-2, Pl. JA0083). Similarly, Dr. Locascio reports that she does not know if UMCP was required to seek agency approval to terminate Plaintiff Shaw, but assumes that the agency sponsor approved of his firing because the SCIF continued to operate. (Locascio Dep. 41:1-6, Pl. JA0258). The Court declines to usurp the jury's function and credit beliefs and assumptions as undisputed evidence that the agency did, in fact, approve of selecting Plaintiff Shaw for termination. Thus, when viewing the facts in Plaintiff Shaw's favor, a reasonable jury could conclude that based on the evidence, the agency did not approve of Plaintiff Shaw's termination.

Furthermore, Plaintiff Shaw has proffered additional evidence from which a reasonable jury could find that UMCP's explanations for why he was terminated are false and pretextual: other employees who were not terminated earned higher salaries. For example, a jury could credit that Mr. Shaw was the lowest paid engineer on his team—paid $8,000-$10,000 less than his fellow engineers—whereas Mr. Romano, who absorbed Mr. Shaw's responsibilities, was paid $280,000 in salary. (Shaw Dep. 134:22, 135:1-3, Pl. JA0196-97; Shaw Ans. to Interrog., at No. 12, Pl. JA0387; Shaw Declaration, ¶ 12, Pl. JA0706; Romano Dep. 10:2-4, Pl. JA0572). Indeed, a reasonable jury could credit Plaintiff Shaw's testimony that a White counterpart received "consistent bumps to his salary," and Plaintiff Shaw did not. (Shaw Ans. to Interrog., at No. 12,

---

[9] As discussed *supra*, the record reflects that Mr. Romano was not credentialed to perform Plaintiff Shaw's COMSEC responsibilities. (Romano Dep. 28:1-8, Pl. JA0590).

Pl. JA0387).

Moreover, Plaintiff Shaw has produced evidence from which a reasonable jury could find that UMCP terminated half of its African American employees during the November 2018 RIF, including Plaintiff Shaw. (Shaw Dep. 132:2-16, Pl. JA0194). Thus, when viewing the foregoing facts in the light most favorable to Plaintiff Shaw and drawing all reasonable inferences in his favor, a reasonable jury could conclude that UMCP considered race when selecting Plaintiff Shaw for termination.

In sum, sufficient evidence permits a reasonable jury to conclude that UMCP's decision to terminate Plaintiff Shaw was false and motivated by racial animus. Summary judgment is therefore denied as to his selection for termination claim.

### iii. Plaintiff Renibe[10]

The Court finds that a reasonable jury could conclude that UMCP's proffered reasons for its decision to terminate Plaintiff Renibe are false and a pretext racial animus. The Court engaged in the same analysis as performed in Section III.B.1.c.ii, *supra*, related to Plaintiff Shaw.

First, regarding whether Plaintiff Renibe was "key" and "required" under the contract, Dr. Fetter testified that Plaintiff Renibe's position may have been listed in the contract as required but

---

[10] Defendants allege that Plaintiff Renibe failed to rebut Defendants' proffered reasons because the only evidence Plaintiff Renibe points to are Plaintiff Renibe's sworn declaration and the allegations in the Amended Complaint. (Reply, p. 7). The case upon which the Defendants rely is not applicable to the present case. *See, Mackey v. Shalala*, 360 F.3d 463, 469-70 (4th Cir. 2004). In *Mackey*, while the Fourth Circuit did review the lower court's resolution of a summary judgment motion, the specific language that Defendants rely upon comes from the portion of the opinion in which the Fourth Circuit is reviewing the trial judge's factual findings following a bench trial. *Id.* Thus, the Fourth Circuit's holding as it pertains to the district court's findings regarding a plaintiff's self-serving opinions at a bench trial is inapplicable to this case. At the summary judgment stage, the Court is not conducting a credibility analysis on evidence properly before it. *See Ecology Servs., Inc.*, 447 F. Supp. 3d at 437; *Dennis*, 290 F.3d at 644-45. Plaintiff Renibe has offered sworn declarations and deposition testimony which constitute evidence the Court can properly consider. *See* Fed. R. Civ. 56(c)(1)(A). To the extent that Plaintiff Renibe relies on allegations made in the Amended Complaint, the Court must agree with the Defendants that allegations in the Amended Complaint are not evidence that the Court may consider. *See Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021) ("As a general rule, when one party files a motion for summary judgment, the non-movant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion." (quoting *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

that Plaintiff Renibe was not listed by name under the agency contract. (Fetter Dep. 33:13-17, Pl. JA0072). However, a reasonable jury could find that Plaintiff Renibe was the COMSEC account manager, one of the three required personnel to operate the COMSEC room under the contract. (Pl. JA0608). UMCP was required to have certain security personnel, specifically a COMSEC account manager, and Plaintiff Renibe was the only one. (Renibe Dep. 66:13-22, Pl. JA0033; JA0608). A reasonable jury could thus conclude that Plaintiff Renibe occupied a "key" and "required" position under the contract.

Second, the Court also finds that there remain genuine issues of material fact regarding whether Plaintiff Renibe's responsibilities could be absorbed by the remaining security personnel and Mr. Romano. The Court adopts here the same rationale articulated in Section III.B.1.c.ii, *supra*, related to Plaintiff Shaw. The Court so finds because a reasonable jury could find that Mr. Romano held no COMSEC certifications and UMCP terminated its only COMSEC certified personnel. (Renibe Dep. 66:13-22, Pl. JA0033; Shaw Dep. 77:10-12, Pl. JA0183; JA0608). Furthermore, there is no evidence before the Court that there were discussions confirming that Mr. Romano could perform Plaintiff Renibe's responsibilities. (Farley Dep. 25:4-11, Pl. JA0204). Indeed, Mr. Farley testified that he does not recall whether such discussions were had. (*Id.*).

Third, as to whether UMCP notified the agency sponsor or sought agency approval in selecting Plaintiff Renibe for termination, the Court finds there remain genuine disputes of material fact. The Court adopts the rationale articulated in Section III.B.1.c.ii, *supra*, related to Plaintiff Shaw. For example, the Court declines to usurp the jury's function and credit beliefs and assumptions as undisputed evidence that the agency did, in fact, approve of selecting Plaintiff Renibe for termination.

Fourth, Plaintiff Renibe has proffered additional evidence that a reasonable jury could

credit that UMCP's explanations as to why he was terminated are false because other employees who were retained were paid higher salaries. Plaintiff Renibe was paid a salary of $75,000 to $80,000 whereas there were other higher paid employees, who were not African American (Plaintiff Renibe points to Mr. Romano who was paid $280,000), who did not hold the security credentials that Plaintiff Renibe held. (Renibe Declaration, ¶ 12, Pl. JA0711; Romano Dep. 10:2-4, Pl. JA0572).

Moreover, Plaintiff Renibe is one of the three employees selected for termination, of only six African American employees employed by UMCP. (Shaw Dep. 132:2-16, Pl. JA0194).

In sum, the Court finds that, when viewing the facts in the light most favorable to Plaintiff Renibe, sufficient evidence permits a reasonable jury to conclude that UMCP's decision to terminate Plaintiff Renibe was false and motivated by racial animus. Accordingly, summary judgment will be denied as to Plaintiff Renibe's selection for termination claim.

2.  The Plaintiffs' Wrongful Termination Claims: Manner of Termination

a.  *The Parties' Arguments*

The Plaintiffs contend that the manner in which they were terminated was discriminatory. Specifically, Plaintiffs were directed to a different building from where they worked, UMCP police were present in the office suite, they were fired, they were terminated without the required security briefing occurring, and they were not allowed to return to their workstations to collect their personal belongings. (*Shaw* Case, Amended Complaint, pp. 3-6, 11; *Renibe* Case, Amended Complaint, pp. 4-7, 11-12).

Defendants argue that Plaintiffs failed to meet their *prima facie* burden of establishing discrimination because there is no evidence that similarly situated employees were terminated in a different manner. First, the comparators the Plaintiffs rely upon to support their discrimination

claims, the research faculty laid off in 2018, did not have the same security clearance and access to information as the Plaintiffs had. Second, UMCP policy requires different termination procedures for research faculty than exempt staff. (Motion, pp. 7-11).

Although not entirely clear to the Court, Plaintiffs appear to counter with two arguments. First, Plaintiffs submit that they need not rely upon comparator evidence to make out a *prima facie* case because: (a) the *McDonnell Douglas* framework is not rigid; (b) there are multiple methods of establishing a *prima facie* case; and (c) the Court should reject Defendants' arguments for the same reasons articulated by the Hearing Examiner. Second, Plaintiffs have identified sufficiently-similar comparators as required under the law: (a) the research faculty fired as part of a 2018 RIF; (b) Ms. Thangpijaigul who was part of the same RIF as the Plaintiffs and is not African American; and (c) employees from Plaintiffs' department that were part of a 2013 RIF. (Opposition, pp. 13-25).

In the Reply, Defendants contend that Plaintiffs offer only conjecture, speculation, and opinion, but no evidence as to how they were treated differently than similarly situated employees. Specifically, there is no actual evidence in the record to establish the details of the RIFs that Plaintiffs rely upon. (Reply, pp. 8-9).

### b.  *Prima Facie Case: McDonnell Douglas Framework*

Plaintiffs' challenges to the manner of their termination raise disparate treatment issues. In the Fourth Circuit, a plaintiff must produce either direct evidence of discrimination or proceed under the *McDonnell Douglas* framework. *Perkins v. Int'l Paper Co.*, 936 F. 3d 196, 206 n.4 (4th Cir. 2019). To establish a Title VII disparate treatment claim under the *McDonnell Douglas* framework, a plaintiff must show: (1) membership in a protected class; (2) satisfactory work performance; (3) adverse employment action; and (4) different treatment from similarly situated

employees outside the protected class. *Id.* at 207.

The parties do not dispute the first three elements of a *prima facie* case for wrongful manner of termination. Accordingly, the Court will address whether each individual Plaintiff has met his burden under the fourth element by identifying a sufficient comparator as set forth below.

Under the fourth element, comparators need not be identical to a plaintiff. *Haynes*, 922 F.3d at 223; *Rodgers*, 586 F. Supp. 3d at 437. The Fourth Circuit has explained "that a comparison between similar employees 'will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same set of circumstances.'" *Haynes*, 922 F. 3d at 223-24 (quoting *Cook v. CSX Transp. Corp.*, 988 F.2d 506, 511 (4th Cir. 1993)). Instead, a comparator need only be "similar in *all relevant respects*, such as whether the employees had the same supervisor, were subject to the same standards, and did not have . . . differentiating or mitigating circumstances that would distinguish . . . the employer's treatment of them." *Rodgers*, 586 F. Supp. 3d at 437 (emphasis added) (cleaned up) (further citations omitted); *see also Haynes*, 922 F.3d at 223-24. Put another way, the fundamental inquiry in determining similarly situated comparators is relevance. *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 382 (4th Cir. 2022) ("A reasonable factfinder could conclude that these comparators are similarly-situated to [plaintiff] in *all relevant respects*." (emphasis added)); *Rodgers*, 586 F. Supp. 3d at 437; *accord Bateman v. Am. Airlines, Inc.*, 614 F. Supp. 2d 660, 674-75 (E.D. Va. 2009) (rejecting a defendant's attempt to draw "unnecessary distinctions based strictly on job titles" when the "the key inquiry is whether the positions are similar in the respects that are relevant to the alleged disparate treatment"). Although the Fourth Circuit "typically frame[s] the issue [of] whether two individuals are similarly situated as a fact question, this does not preclude a court from deciding as a matter of law that there is an insufficient basis for comparison to submit the question to the fact-finder." *Tinsley v. City of*

*Charlotte*, 854 F. App'x 495, 501 (4th Cir. 2021); *Grant v. Atlas Rest. Grp. LLC*, Civ. No. GLR 20-2226, 2024 WL 473737, at *5 (D. Md. Feb. 7, 2024).

Because the alleged disparate treatment in this case is the manner in which the Plaintiffs were fired, the Court will analyze whether the proffered comparators are similarly situated in all **relevant** aspects with respect to how they were terminated.

i.  Plaintiff Shaw: *Prima Facie* Evidence

As a preliminary matter, the parties do not dispute that police presence was only approved for the termination of the Plaintiffs and Ms. Vines. Indeed, it is undisputed that other employees fired as part of UMCP's RIF were notified in their offices in the building in which they worked and that no UMCP police were present. (Fetter Dep. 57:3-6, Pl. JA0453; Renibe Dep. 52:20-22, 53:1, Pl. JA0025-26; Shaw Ans. to Interrog., at No. 9, Pl. JA0313).

As to whether the comparators identified by Plaintiffs are similarly situated, what is relevant to the Court's inquiry is whether the comparators and Plaintiffs were subject to the "same supervisor, . . . the same standards, and did not have . . . differentiating or mitigating circumstances that would distinguish" **how they were terminated**. *See Rodgers* 586 F. Supp. 3d at 437. Put another way, the Court will consider whether the comparator(s) and Plaintiffs: (a) were fired by the same supervisor; (b) were fired as part of the same RIF; (c) had the same employee classification namely, exempt staff and thus subject to the same standards or protocol for terminating exempt staff; (d) were, or were not, permitted to work after termination; and (e) maintained a level of security clearance.

Defendants argue that there were differentiating and mitigating factors that justify why UMCP treated the alleged comparators differently from how it treated Plaintiffs. According to Defendants, the research faculty did not possess the same security clearances the Plaintiffs did and

40

were not exempt staff employees. (Fetter Dep. 51:14-25, 52:1-14, Pl. JA0085-86). The Court must ultimately agree with Defendants that the research faculty are not similarly situated. Even when viewing the facts in Plaintiff Shaw's favor, a reasonable jury could only find that the research faculty were not fired by the same supervisor as Plaintiff Shaw, Mr. Farley, but instead were fired by Dr. Fetter. (Fetter. Dep. 13:21-24, 14:12-15, Pl. JA0062-63). In addition, a reasonable jury could only find that the researchers were faculty employees, not exempt staff like Plaintiff Shaw, and continued to work after being notified of their termination, unlike Plaintiff Shaw. (Fetter Dep. 51:23-25, 52:1-3, Pl. JA0085-86). Accordingly, no reasonable jury could find that the research faculty are similarly situated in all relevant aspects.

Next, as to the 2013 employees, when construing the facts in the light most favorable to Plaintiff Shaw, the record reflects that during the 2013 RIF, employees that were part of Plaintiff Shaw's department were notified in advance of being laid off, without UMCP police presence, and were permitted to continue to work after being notified. (Shaw Declaration, ¶¶ 3, 10, Pl. JA0702, 705). However, there is no evidence before the Court that the 2013 employees were fired by the same supervisor as Plaintiff Shaw. Mr. Farley confirmed that the only RIF in CASL that he was involved in was the termination of Plaintiffs, Ms. Vines, and Ms. Thangpijaigul. (Farley Dep. 11:17-25, 13:10-14, Pl. JA0473, 475). Thus, no reasonable jury could conclude that the 2013 employees were subject to the same supervisor as Plaintiff Shaw when they were fired by UMCP. Ultimately then, no reasonable jury could find that the 2013 employees were similarly situated to Plaintiff Shaw in all relevant aspects.

Finally, the Court finds that a reasonable jury could conclude that Ms. Thangpijaigul is sufficiently similarly situated to Plaintiff Shaw in all relevant aspects. Ms. Thangpijaigul was fired by the same supervisor as Plaintiff Shaw, Mr. Farley. (Farley Dep. 40:22-25, 41:6-13, Pl. JA0219-

20.). In addition, Ms. Thangpijaigul was part of the same November 2018 RIF as Plaintiff Shaw. (Pl. JA0263). Indeed, when Dr. Locascio approved the termination of Plaintiff Shaw, Ms. Thangpijaigul was included in that list of individuals selected for termination provided to her. (*Id.*). Moreover, a reasonable jury could find that Ms. Thangpijaigul was exempt staff, just like Plaintiff Shaw, and that she was subject to the same standards or protocols for firing exempt staff. (*Id.*). For example, she was not permitted to continue working after being notified of her layoff and placed on involuntary administrative leave. (Shaw Ans. to Interrog.," at No. 9, Pl. JA0313). Furthermore, although the record is silent as to the exact level of security clearance held by Ms. Thangpijaigul, there is evidence that a reasonable jury could credit to find that Ms. Thangpijaigul held a security clearance that was also deactivated once she was terminated. (Farley Dep. 29:16-17, Pl. JA0208). Finally, it is undisputed that Ms. Thangpijaigul is not a member of Plaintiff Shaw's protected class. (Farley Dep. 28:14-15, Pl. JA0207). Accordingly, the Court finds that a reasonable jury could conclude that Ms. Thangpijaigul is similarly situated in all relevant aspects and thus a proper comparator.

In sum, when construing the facts in the light most favorable to Plaintiff Shaw, the Court finds that, as to the manner of his termination, he has met his burden under the fourth element of a *prima facie* case. Accordingly, as to that argument, summary judgment will be denied.

ii.   Plaintiff Renibe: *Prima Facie* Evidence

The Court analyzed the specific facts and engaged in the same analysis with respect to Plaintiff Renibe related to possible comparators, as it did above in Section III.A.2.b.i, *supra*, with respect to Plaintiff Shaw. Thus, the Court finds that Plaintiff Renibe has identified a sufficiently similarly situated comparator, Ms. Thangpijaigul, and has met his burden under the fourth element

of a *prima facie* case. Accordingly, as to that argument, summary judgment will be denied.

      *c.   Legitimate Non-Discriminatory Reasons and Pretext*

The applicable law with regards to legitimate nondiscriminatory reasons and pretext under the *McDonnell Douglas* framework is set forth in Section III.A.1.c, *supra*.

Defendants have produced evidence related to their articulated security concerns that led them to decide to fire the Plaintiffs in a separate building with UMCP police present. Specifically, Defendants assert that: (1) UMCP policy does not permit exempt staff to work after being notified of layoffs and therefore there was no reason for Plaintiffs to have access to their workstations after being notified of their termination; (2) UMCP police presence during the termination was warranted because Plaintiffs had access to highly classified information that other employees did not; and (3) Mr. Farley had concerns regarding how Plaintiffs would react to being fired because he was aware of a prior incident between Ms. Madoo and Plaintiff Renibe. (Fetter Dep. 51:14-25, 52:1-14, Pl. JA0085-86; Pl. JA0305-09; Farley Dep. 36:1-10, Pl. JA0215). Defendants have produced admissible evidence of legitimate nondiscriminatory reasons for the manner in which UMCP terminated Plaintiffs, thus, the burden shifts to Plaintiffs to establish that the Defendants' proffered reasons are false and a pretext for unlawful discrimination. *See Haynes*, 922 F.3d at 223.

Defendants contend that Plaintiffs have not rebutted UMCP's legitimate reasons for firing Plaintiffs in a separate building with a UMCP plain-clothes police officer because Plaintiffs have failed to produce evidence that demonstrates Defendants' proffered reasons are a pretext for unlawful discrimination. (Motion, pp. 15-17, Reply, pp. 8-9). In the Opposition, Plaintiffs assert that UMCP's reasons are pretextual and that the police presence was not necessary and racially motivated for two principal reasons. First, Plaintiffs argue that UMCP deviated from its usual manner of conducting RIFs because it is undisputed that it did not conduct any other RIFs in this

manner before or after Plaintiffs were fired. Thus, Plaintiffs contend that consistent with the relevant caselaw, UMCP's deviation from its standard practice is evidence of pretext. Second, Plaintiffs assert that UMCP has not provided a legitimate non-discriminatory reason that demonstrates a justified fear that would warrant police presence. Specifically, Plaintiffs appear to contend that Defendants fears are based on racial stereotypes. (Opposition, pp. 25-27). Ultimately, Plaintiffs aver that a reasonable juror could conclude that Defendants' proffered reasons are false and pretextual.

The Court will analyze the parties' arguments under the applicable law as set forth above in Section III.A.1.c, *supra*.

       i.  <u>Plaintiff Shaw</u>

When construing the facts in Plaintiff Shaw's favor, the Court finds that there remain genuine disputes of material fact regarding whether Defendants' proffered reasons are false and a pretext for racial animus.

First, it is undisputed that no other so-called RIF at UMCP involved police presence. (Fetter Dep. 57:3-6, Pl. JA0453). Despite that fact, the plan for how to conduct the terminations of Plaintiffs was outlined by UMCP senior management officials, including Dr. Fetter and Mr. Farley. (Fetter Dep. 43:10-17, Pl. JA0079). Mr. Farley testified that it was his usual practice to request police presence outside the building, but when he terminated Plaintiff Shaw, he did so with police presence **inside** the office suite. (Shaw Dep. 67:5-12, Pl. JA0140; Renibe Dep. 48:17-22, Pl. JA0021; Farley Dep. 34:10-17, Pl. JA0213). A reasonable jury could thus find that Mr. Farley deviated from his stated usual practice when he fired Plaintiff Shaw. While Mr. Farley testified that he did so at the behest of UMCP's police chief, there is no evidence that Plaintiff Shaw was perceived as threatening or behaved in a manner that would necessitate police presence inside the

office suite when he was fired. (Farley Dep. 34:10-17, 38:9-12, Pl. JA0213, 217; Shaw Dep. 137:1-14, Pl. JA0199). Importantly, the email requesting police presence makes no reference to any concerns related to Plaintiff Shaw. (Pl. JA0290). Indeed, Mr. Farley conceded that there was no need for police presence inside the office suite related to firing Plaintiff Shaw. (Farley Dep. 137:1-14, Pl. JA0199).

Furthermore, Plaintiff Shaw avers that his colleagues were instructed to lock their doors the day he was notified of his layoff. (Shaw Ans. to Interrog., at No. 9, Pl. JA0313). It is undisputed that UMCP terminated half of its African American employees during the November 2018 RIF, including Plaintiff Shaw. (Shaw Dep. 132:2-16, Pl. JA0194). What is even more compelling is that only the African American employees at UMCP were notified in a separate building and with police presence. (Fetter Dep. 57:3-6, Pl. JA0453). When Mr. Farley terminated a fourth employee, Ms. Thangpijaigul, he did not request police presence at all. (Farley Dep. 28:10-13, 40:22-25, Pl. JA0207, 219). Indeed, he did not think to do so. (*Id.*).

Accordingly, when viewing the facts in the light most favorable to Plaintiff Shaw, and drawing all reasonable inferences in his favor, the Court finds that Plaintiff Shaw has sufficiently established a genuine issue of material fact such that a reasonable jury could conclude that the Defendants' proffered reasons are false and a pretext racial animus.

In sum, summary judgment will be denied as to Plaintiff Shaw's manner of termination claim.

ii.   Plaintiff Renibe

The Court analyzed the specific facts and engaged in the same analysis with respect to Plaintiff Renibe, as it did in Section III.2.c.i, *supra*, related to Plaintiff Shaw. The Court thus finds that a reasonable jury could conclude that Mr. Farley deviated from his usual practice when he

fired Plaintiff Renibe with police presence inside the office suite, and that UMCP's reasons are false and a pretext for racial animus.

The Court also finds that there are genuine issues of material fact regarding Defendants' proffered reasons for police presence in the office suite when firing Plaintiff Renibe. The alleged reason for UMCP's concern regarding Plaintiff Renibe's reaction to being fired remains unclear. In the initial email requesting police presence, Mr. Farley expressed that he was "slightly concerned with [Plaintiff Renibe's] potential reaction" and that Plaintiff Renibe had told Mr. Farley that he "is ex-PGD." (Pl. JA0290). Mr. Braniff responded to that email chain stating that Plaintiff Renibe "is a former golden gloves boxer in NYC, was some kind of Air Force Special Operations airman, and has a physical intensity about him that warrants [UMCP police] presence." (Pl. JA0291). Subsequently, in the briefing and deposition transcripts contained in the Joint Appendices, Defendants allege that Mr. Farley's concern was motivated by an incident between Plaintiff Renibe and Ms. Madoo. (Motion, pp. 6, 17; Farley Dep. 36:21-25, 37:1-11, Pl. JA0215-16). In contrast, Plaintiff Renibe maintains that he never acted inappropriately. (Renibe Declaration, ¶ 13, Pl. JA0712). Given UMCP's shifting explanation and the contradictory testimony, a reasonable jury could conclude that UMCP's reason for requesting police presence were false and the real reason was based on racial stereotypes.

In sum, when viewing the facts in the light most favorable to Plaintiff Renibe, the Court finds that Plaintiff Renibe has established a genuine dispute of material fact such that a reasonable jury could conclude that the Defendants' proffered reasons are false and a pretext for racial animus. Summary judgment is denied as to Plaintiff Renibe's manner of termination claim.

## B.  Plaintiff Renibe's Claims Under Sections 1981 and 1983

Plaintiff Renibe advances discrimination claims against the Individual Defendants in their

official capacities, pursuant to 42 U.S.C. §§ 1981 and 1983. (*Renibe* Case, Amended Complaint, p. 13).

The Individual Defendants contend that they are entitled to summary judgment on Plaintiff Renibe's Sections 1981 and 1983 claims for two reasons. First, prospective injunctive relief is the only remedy available under Sections 1981 and 1983. Thus, because Plaintiff Renibe is no longer seeking such relief, summary judgement is warranted. Second, and alternatively, assuming that Plaintiff Renibe can advance claims under Sections 1981 and 1983, summary judgment in their favor on these claims is appropriate for the same reasons that entry of summary judgment is appropriate on Plaintiff Renibe's Title VII claims. (Motion, pp. 18-21).

Plaintiff Renibe counters only that the Defendants' arguments should be rejected for the reasons identified by the Hearing Examiner. (Opposition, p. 28). Plaintiff Renibe does not address Defendants' argument that because he is no longer seeking injunctive relief, entry of summary judgment on these claims is required.

As an initial matter, the Court finds that because Plaintiff Renibe has failed to respond to Defendant's arguments about injunctive relief, Plaintiff Renibe has tacitly conceded that summary judgment on Count II is appropriate. *See Stenlund v. Marriott Int'l, Inc.*, 172 F. Supp. 3d 874, 887 (D. Md. 2016); *Mentch v. Eastern Savings Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997); *Nyanka v. MVM, Inc.* Civ. No. PWG 15-645, 2016 WL 4240290, at *7 (D. Md. Aug. 11, 2016).

Alternatively, to the extent that Plaintiff Renibe has not conceded that summary judgment must be entered, if he is somehow seeking monetary damages from the Individual Defendants, the Eleventh Amendment bars such claims.

It is well settled that "[t]he Eleventh Amendment, rooted in principles of sovereign immunity, bars suits against an unconsenting State brought in federal courts by private parties."

*Wyatt v. Univ. of Md.*, Civ. No. JKB 23-0742, 2023 WL 4551861, at *2 (D. Md. July 13, 2023). As courts in this District have held, the University of Maryland system is an "instrumentality" of the State of Maryland for Eleventh Amendment purposes. *See, e.g., Williams v. Univ. of Md. Coll. Park*, Civ. No. PJM 22-131, 2023 WL 5570196, at *2 (D. Md. Aug. 29, 2023) (citing Md. Code Ann., Educ. § 12-102(a)(1)-(3)).

In addition, in this District, the Eleventh Amendment proscription not only applies to "suits against instrumentalities of the state," but also to "state officials . . . acting in their official capacities." *Wyatt*, 2023 WL 4551861, at *2. Thus, a lawsuit against a State, State instrumentality, or State officials acting in their official capacity is permitted only if: "(1) the State has waived its Eleventh Amendment immunity; (2) Congress has abrogated the States' Eleventh Amendment Immunity pursuant to a valid grant of constitutional authority; or (3) the suit seeks prospective injunctive relief against state officials." *Id.*

Regarding waiver of Eleventh Amendment immunity, "while the State of Maryland has waived Eleventh Amendment immunity as to some claims in its own state courts, it has not done the same as to claims in Federal court." *Id.* There is no evidence before the Court that the Individual Defendants acting in their official capacities have waived Eleventh Amendment Immunity. (Pl. JA0001-755; Def. JA0001-344). Next, regarding Congress' abrogation of Eleventh Amendment immunity, in this District the law is clear that "Congress did not abrogate States' Eleventh Amendment immunity for claims arising under 42 U.S.C. §§ 1981, 1983." *Smothers v. Maryland*, Civ. No. DKC 18-3451, 2019 WL 3323215, at *2 (D. Md. July 24, 2019), *aff'd,* 788 F. App'x 191 (4th Cir. 2019); *Wyatt*, 2023 WL 4551861, at *3 (same). Accordingly, the Court finds that the only remedy available to Plaintiff Renibe in his action against the Individual Defendants is prospective injunctive relief. *Quern v. Jordan*, 440 U.S. 332, 338 (1979) (holding that in a Section 1983 action

against the state "a federal court's remedial power . . . is necessarily limited to prospective injunctive relief, and may not include a retroactive award which requires the payment of funds from the state treasury" (internal quotations and citations omitted)); *see also Wyatt*, 2023 WL 4551861, at *2.

Here, Plaintiff Renibe has testified that he is not seeking reinstatement of his position as security coordinator at UMCP. (Renibe Dep., 165:1-5, Pl. JA0057). Accordingly, the Court will grant the Individual Defendants' request for entry of summary judgment on Count II of Plaintiff Renibe's Amended Complaint related to 42 U.S.C. §§ 1981 and 1983.

## IV.   CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment, (ECF No. 68), is **GRANTED IN PART AND DENIED IN PART**.

A separate Order will follow.


Date: March 18, 2025                          _____/s/_____
                                              The Honorable Gina L. Simms
                                              United States Magistrate Judge